781 A.2d 913

Hadden Irving CLARK,

v.

STATE of Maryland.

No. 2123, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Sept. 26, 2001.

Michael R. Braudes and Margaret L. Lanier, Assistant Public Defenders (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Ann N. Bosse, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Douglas Gansler, State's Attorney for Montgomery County, Rockville, on the brief), for appellee.

Submitted before SALMON, THEODORE G. BLOOM (Ret., specially assigned) and RAYMOND G. THIEME (Ret., specially assigned), JJ.

SALMON, Judge.

In October 1999, Hadden Clark ("Clark") was convicted of the murder of Michelle [1] Dorr ("Michelle"). Prosecutors were

---

1. In the transcript, the victim's name is spelled "Michelle," but in numerous newspaper articles her name is spelled "Michele." We have used the spelling adopted by the court reporter.

able to obtain a second-degree murder conviction despite the fact that Michelle's body had not then been located.

After Clark filed this timely appeal, he elected to cooperate with Montgomery County, Maryland, authorities. On January 7, 2000, Clark led police to a wooded ravine near Route 29 in Silver Spring, Maryland. There the police found Michelle's grave site.

In this appeal, Clark does not contend that the State failed to produce sufficient evidence to prove he murdered Michelle. Instead, he contends that the lower court committed reversible error in failing to dismiss his indictment, failing to strike jurors for cause, failing to suppress various items of evidence that were (allegedly) illegally obtained, improperly admitting evidence against him, and improperly restricting his counsel's cross-examination of certain key witnesses.

Part I of this opinion summarizes evidence introduced at trial, as well as testimony considered at numerous motions hearings held prior to trial. We have excluded many facts that do not concern the issues raised in this appeal.

## I.

On Saturday, May 31, 1986, Michelle Dorr, age six, disappeared. That disappearance caused an intensive investigation by the Montgomery County police. Widespread media attention was also focused upon Michelle's disappearance.

Immediately prior to her disappearance, Michelle had been staying with her father, Carl Dorr, at his home on Sudbury Road in Silver Spring, Maryland. One house separated the home of Geoffrey Clark, appellant's brother, from Carl Dorr's home. Living with Geoffrey Clark at the time of Michelle's disappearance was his daughter, Elizabeth, and appellant. Elizabeth was about Michelle's age and her frequent playmate.

Carl Dorr reported Michelle missing to the police shortly after 4 p.m. on May 31, 1986. He told the police that when he last saw his daughter she had been in a wading pool in his backyard, dressed only in a pink and white polka-dot bathing

suit. He said he discovered her missing about 4 p.m. Initially he thought that she might be playing with Elizabeth Clark, but her father told him that he and Elizabeth had not returned home until about 3 p.m. and that they had not seen Michelle that day.

Shortly after Michelle's disappearance, Mr. Dorr told the police that he was not sure exactly when he had last seen his daughter, but he knew it was after she had eaten lunch. He initially estimated that he saw her last about 1 p.m., but afterwards his time estimates varied.

Appellant worked, on May 31, 1986, as a chef at the Chevy Chase Country Club ("the Country Club") located on Connecticut Avenue in Montgomery County. On that day, according to later trial testimony, he was in the process of moving out of his brother's home on Sudbury Road. That home is about ten minutes driving distance from the Country Club. Records kept by the Country Club show that at 2:46 p.m. on May 31 appellant started work.

During the first two weeks of June 1986, police intensively canvassed the neighborhood where Mr. Dorr lived in an attempt to find witnesses who might have information about Michelle's disappearance. Among those interviewed were Jonathan Binder and his wife. The Binders lived at 9127 Sudbury Road, which was between the Clark's and the Dorr's residences. The Binders told the police that on May 31, between 11:30 a.m. and 12:20 p.m., they left their home to go to a baptism. Before they left, Mr. Binder saw appellant moving a duffle bag and a trunk into his white pickup truck.

O'Neil Cammock was working for the Binders on May 31, starting at 8 a.m. In the afternoon, after he had finished his work, he went to the Clarks' residence to use a phone.

Mr. Cammock was interviewed by a police officer on June 9, 1986. The officer's notes regarding that interview read as follows:

Left the Binder residence, then used phone at Clark residence. A male, does not know his name, was at the

house and let him in the residence via the side door. Used the phone in the kitchen.

Said this white male had a small white female with him and that it was not Michelle. After using the phone in an attempt to get a ride home, he left and walked home.

Stated the white man was still at the house with the white female child, packing things in the truck.

Within nine days of Michelle's disappearance, Montgomery County police detectives interviewed appellant twice. On June 5, Detective Wayne Farrell saw appellant loading his white pickup truck in the driveway at Geoffrey Clark's residence. Officer Farrell stopped, and appellant told him that he had been at his brother's home on the day of Michelle's disappearance but had only been there for approximately two minutes to feed his rabbits. According to Detective Farrell, appellant was "preoccupied" at the time of the first interview, and accordingly, the first interview was brief.

Three days later, appellant was questioned more intensely by the police. Appellant told Detective Farrell and another police officer that he had been at his brother's home between 1:30 and 1:45 p.m. on May 31 and had allowed a man, fitting Mr. Cammock's description, to use the telephone. When the questioning segued to matters dealing specifically with Michelle's disappearance, appellant's demeanor changed—according to later trial testimony of police officers who were present.

During the second interview, appellant asked to use the bathroom. While in the bathroom, appellant cried and vomited. When one of the police officers asked him to talk about what he had done to Michelle, appellant replied, "I don't know. I may have blacked out. I may have done something." Afterwards, appellant held his head and rocked back and forth and said, once again, "I may have done something. I may have blacked out." Appellant then asked to speak with his psychiatrist. The police granted the request. After a conversation with his psychiatrist, appellant asked to leave police headquarters, and he was permitted to do so.

Despite appellant's strange behavior during the second police interview, he was not, initially, the prime suspect in the disappearance. Michelle's father was. Accordingly, Mr. Dorr was subjected to frequent and extremely intense questioning by the police. The lead investigator, Lieutenant Michael Garvey, later admitted that he "played on [Mr. Dorr's] emotions" and was

> [e]xtremely aggressive to the point where we would yell and scream. I would yell and scream at him. I would use profanity. I would accuse him of things [such as killing Michelle and being a negligent father]. Basically just to break him down as best I could, get him emotionally upset and then come back and ask questions of what he did or what he thought. I would use the tactic of just suppose something happened and tell me how you think it would happen. . . .

In addition to conducting such interrogations, police kept Mr. Dorr under surveillance, tapped his phone, reviewed his bank and video rental records, questioned his employers, co-workers, friends, neighbors and family, and used "outside private search agencies."

During the weeks and months following Michelle's disappearance, Mr. Dorr had a series of nervous breakdowns. He had delusions that he was Jesus Christ and was capable of bringing Michelle back to life. He was hospitalized, and when he was released, the police continued to investigate him. He then suffered another mental breakdown.

Mr. Dorr made several incriminating statements to the police during the course of their investigation. In one statement, he claimed to have suffocated Michelle and put her body in a sewer; in another, he said that he had buried her near his father's grave.

In May of 1988, Michelle's mother made an appearance on "America's Most Wanted" and told a national television audience that Mr. Dorr had killed their daughter. When Mr. Dorr saw the program, he went to his ex-wife's house and demand-

ed to be let in, saying that he knew where Michelle was and the truth was going to "burn a hole in your soul."

In October 1992, Laura Houghteling disappeared. Ms. Houghteling was a twenty-three-year-old resident of Montgomery County. Appellant had, at one time, worked as a handyman at the Houghteling residence. Laura Houghteling's disappearance, like Michelle's, provoked great media attention in the Washington metropolitan area.

By the latter part of October 1992, appellant had become the prime suspect in the disappearance of both Laura Houghteling and Michelle. Appellant was questioned by the police on October 24, 1992, about both of the disappearances.

On October 31, 1992, appellant unexpectedly arrived at the Rhode Island home of his sister, Allison Huggins. In later testimony, Ms. Huggins described her brother as appearing "very disheveled and very nervous ... very agitated." She had never before seen him that way. Appellant told her that the police were "trying to pin a crime on him because he was a homeless man." On the same day, appellant went to the Clark family plot in a cemetery in Wellfleet, Massachusetts, where he camped for the night.

Appellant returned to Maryland shortly after his trip to Massachusetts, and on November 6, 1992, the Montgomery County police conducted a lengthy interrogation concerning the disappearance of both Laura Houghteling and Michelle. Thereafter, appellant's truck was searched. The police found various items in the truck, including an eyeglass case packed with dirt and a map of a cemetery.

During questioning on November 6, appellant was deprived of sleep. Additionally, he repeatedly asked to consult with counsel-but the requests were denied. Despite these violations of his rights, appellant did not incriminate himself in the matter of Michelle's disappearance.

In January of 1993, police were able to determine that the map found in appellant's car depicted the cemetery in Massachusetts that appellant had visited on October 31, 1992. On

January 3, 1993, Sergeant Arthur Parker, of the Wellfleet, Massachusetts, police department, went to the cemetery and noticed that topsoil within the Clark family cemetery plot was "disturbed." The location of this disturbance corresponded closely to an asterisk on the map found in appellant's pickup truck. In addition, he noticed rust marks on a cemetery marker near the Clark family plot.

Barbara Murphy, the cemetery caretaker, told Sergeant Parker that the ground in the Clark plot had not been disturbed the last time she had been there on October 14, 1992. Bruce Hall, an FBI expert knowledgeable in the field of soil comparisons, examined part of the undercarriage of appellant's truck (seized by police on November 6) and found that the soil consisted of the same essential minerals as the rust marks left on the cemetery marker. He also discovered that the disturbed soil area of the Clark family plot was the likely source of the dirt contained in the eyeglass case found in appellant's truck.

Massachusetts State Trooper Kathleen Barrett, the handler of a cadaver dog named Dan, brought Dan to the Wellfleet cemetery on January 3, 1993. Cadaver dogs are trained to recognize the scents of blood, tissue, and decomposition of humans. On January 3, Trooper Barrett released Dan in the Wellfleet cemetery. Dan criss-crossed the cemetery, then indicated an alert in the area of the soil disturbance, which was near a headstone marked "Clark." Barrett took Dan aside and waited while other officers transferred soil (from the place where Dan had alerted) onto a tarp. She then released Dan to search again. This time, Dan alerted on the soil lying on the tarp and not on the hole from which the soil had been excavated.

The second cadaver dog to search the Wellfleet cemetery was a canine named Panzer owned by the Rhode Island State Police. Panzer worked her way through the cemetery for twelve to fifteen minutes, then alerted on an area behind appellant's grandfather's grave, which was the same place where Dan had initially alerted. Panzer and his handler

returned to the cemetery on a later date. The handler started Panzer from a different location, but the dog worked her way back to the same spot and alerted once more. The alert was "less intense," however, than it had been earlier.

In 1993, appellant pled guilty to second-degree murder of Laura Houghteling and was sentenced to thirty-years imprisonment for that crime.

According to later trial testimony, appellant, while imprisoned for the Houghteling murder, talked, at various times, to five prison inmates about the disappearance of Michelle Dorr and made incriminating statements to all of them. What appellant told two of these inmates is irrelevant for our purposes—but what he allegedly said to three others is relevant.

In August 1994, two prison inmates, John Friendly and Ben Chambers, decided to try to get information from appellant concerning Michelle's disappearance in hopes of receiving more lenient treatment by the authorities. The two devised a scheme by which they would convince appellant to tell them what had happened by pretending that they were going to write a book about appellant's life. In furtherance of this scheme, Friendly asked appellant if he had killed Michelle, and appellant (allegedly) replied, "Yeah." Appellant then told Friendly that the murder had happened while he was in his brother's house. Appellant explained that he had heard a noise upstairs; he went out to his truck to retrieve his knives and returned with a twelve-inch butcher knife. Appellant found Michelle playing in his niece's bedroom; he then slashed her with his knife. The blow almost decapitated Michelle. After the killing, appellant placed Michelle's body in a green trash bag, put the trash bag into a duffle bag, and put the duffle bag in the back of his truck. He also told Friendly that he had cleaned up Elizabeth's room very well, getting rid of everything that had blood on it. He then drove his truck part way to the Country Club, unloaded his bicycle from the back of the truck, and biked the rest of the way to his place of employment. Appellant told Friendly that he knew Michelle

because she always came to his brother's house to play with his niece. Chambers added a few details but basically claimed that appellant had told him the same story as the one related by Friendly.

James Beckette testified that he was a friend of appellant's between September 1995 and May 1996 while the two were inmates at Hagerstown. Beckette recounted that once, when he and appellant were chatting, appellant admitted that he had killed Michelle. Appellant added that he had known Michelle as a friend of his niece. Beckette inquired, "Why did you do it?" and appellant replied, "I didn't mean to do it." Beckette described appellant as "deep in thought . . . almost childlike . . . very worried, very upset" during this conversation. Abruptly, however, appellant "came out of a fog . . . realized what he had said to me," and stated that he did not want to talk about the subject any more.

Beckette read a newspaper article about the Dorr case that named the detectives who were still investigating the disappearance. He then contacted the detectives named in the article and told them of appellant's confession.

On September 23, 1998, appellant was interrogated at length by Montgomery County police officers. The interrogation was videotaped and later played to the jury at appellant's trial, after it had been redacted to eliminate all references to the Laura Houghteling case. In the interview, appellant denied making incriminatory statements about Michelle's disappearance to any of his fellow inmates. He acknowledged that he knew Michelle because she was a playmate of his niece. He also acknowledged, ambiguously, "I might have seen [Michelle] while she was alive in the house." He admitted having been at his brother's home the day Michelle disappeared but denied speaking with Mr. Cammock. Arguably, his denial that he had spoken with Mr. Cammock contradicted what he told the police on June 8, 1986.

Appellant said in the September 23, 1998, interview that he rode his bicycle to work on the day Michelle disappeared and estimated the bike trip took approximately an hour. He

stated that he was moving out of his brother's house that day due to problems he was having with Geoffrey.

During the September 1998 interview, appellant provided details regarding the trip he took to Wellfleet cemetery late in October 1992. He said that he left Maryland because the police investigation made him uncomfortable. He acknowledged that he usually carried shovels and other tools in his truck for landscaping work. Asked about the topsoil disturbance in the Clark plot at the cemetery, he speculated that "[s]omething got dug up. Maybe some dog was looking for some bones ... maybe a cat."

Appellant was questioned extensively about incidents not directly concerning Michelle's disappearance. To these questions, he demonstrated a clear recollection of events. Yet, when he was asked about matters directly connected with Michelle's disappearance and his visit to the cemetery in late October 1992, appellant's memory seemed hazy. When asked about his ability to remember some things, but not others, appellant replied, ambiguously, "You make me remember. When you do something painful, you don't want to remember."

In 1998, appellant was incarcerated in Hagerstown where Thomas Sheasley, a correctional caseworker, was employed. Mr. Sheasley got along well with appellant and at trial testified as to three conversations he had with appellant that (arguably) incriminated the latter. Those conversations will be described, *infra*, in Part VI.

Because of what Clark told his fellow prisonmates, the police sprayed Elizabeth Clark's bedroom with luminol, a chemical that causes blood (invisible to the naked eye) to become luminescent. Using this preliminary test, blood was found on and in the bedroom's hardwood floor. The areas of luminescence were then swabbed for analysis and the floor was removed in its entirety and subjected to further testing.

FBI forensic consultant Robert Spalding, an expert in serology and blood pattern analysis, found that the floor contained evidence of blood in eighty-five locations, indicating to him that there was more blood present than would have come from

normal childhood mishaps, such as nosebleeds, etc. Spalding believed that a beach towel could have been used to absorb a large quantity of blood that had once been present.

Defense witness Megan Clement, an expert in mitochondrial DNA analysis, tested the floor samples, performing comparisons with the blood of Michelle's mother and of appellant. Clement concluded that the DNA extracted from the floor samples could not have come from appellant, nor could the blood have come from Michelle or any other child of Michelle's mother. Some of the blood on the floor, however, was insufficient in quantity to perform DNA testing.

Additional facts will be set forth as necessary to answer the eleven questions appellant presents.

## II.

Appellant first contends that the indictment handed down by a Montgomery County grand jury should have been dismissed because an assistant state's attorney intentionally withheld exculpatory evidence. In support of that contention, appellant focuses on the expert testimony of Susan Ballou, who told the grand jury that results of the DNA tests of blood recovered from the floor of Elizabeth Clark's bedroom could have come from appellant or from Michelle Dorr, but that the tests were inconclusive. That testimony was believed to be true by the witness. But unknown to Ms. Ballou when she testified before the grand jury, but known at that time by an assistant Montgomery County prosecutor, was the fact that additional DNA testing had been performed by a different laboratory and that these later DNA tests had excluded both Michelle and appellant as the source of the blood. Therefore, the grand jury was led to believe that the DNA tests did not rule out the possibility that the blood tested was that of either Michelle or appellant. Because the State did nothing to correct this misinformation, appellant's counsel argues that the indictment in its entirety should have been dismissed.[2]

---

2. At trial, the jury was told that the DNA test results showed that neither Michelle Dorr nor appellant were the sources of the blood that

On September 21, 1999, Judge Paul Weinstein conducted a hearing regarding appellant's motion to dismiss based upon prosecutorial misconduct before the grand jury. Judge Weinstein found that an assistant Montgomery County prosecutor knew of the more recent DNA lab test when Ms. Ballou appeared before the grand jury. He also found, however, that the failure to disclose the results of the most recent lab test to the grand jury was inadvertent. He concluded that the prosecutor's unintentional failure to disclose exculpatory material did not warrant a dismissal of the indictment. We agree with Judge Weinstein's conclusion.

> The grand jury is an inquisitional and accusatory body. It does not determine the guilt or innocence of the accused as that decision is vested in the petit jury or court, if there be a non-jury trial. That an indictment is founded on tainted evidence is no ground for dismissal.... The rules of evidence are not applicable to grand jury proceedings.

*Hopkins v. State,* 19 Md.App. 414, 426, 311 A.2d 483 (1973).

Nineteen years after we decided *Hopkins,* the United States Supreme Court said:

> The grand jury's functional independence from the Judicial Branch is evident both in the scope of its power to investigate criminal wrongdoing and in the manner in which that power is exercised....
>
> Given the grand jury's operational separateness from its constituting court, it should come as no surprise that we have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure. It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge.... As a consequence, neither in this country nor in England has the suspect *under investigation by the grand jury ever been thought to*

---

was tested. This did not necessarily mean, however, that Michelle had not bled to death there. This latter statement is true because many of the blood spots in the room did not contain enough material to perform a DNA test.

*have a right to testify or to have exculpatory evidence presented.*

*United States v. Williams,* 504 U.S. 36, 48–52, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (citations omitted) (emphasis added). Thus, the *Williams* Court refused to dismiss the defendant's indictment under federal rules that were designed to insure the integrity of the grand jury's functions, even though, in *Williams,* a prosecutor had withheld exculpatory evidence from the grand jury. The Supreme Court said that the grand jury had no obligation to consider all "substantial exculpatory" evidence, and therefore the prosecutor had no binding obligation to present it. *Id.* at 53, 112 S.Ct. 1735.

Although Maryland appellate courts have heretofore not had occasion to analyze *Williams,* the Court of Appeals previously has quoted *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), for the principle that

[t]he grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of *inadequate or incompetent evidence.* . . . *Everhart v. State,* 274 Md. 459, 487 [337 A.2d 100] (1975).

(Emphasis added.)

The Maryland Court of Appeals has also refused to dismiss indictments for several other types of flaws alleged to have been caused by the prosecutor. In *Bartram v. State,* 280 Md. 616, 374 A.2d 1144 (1977), the Court held that dismissal of the charges was not warranted even if the prosecutor made improper remarks about a previous indictment and presented the case in a manner that impermissibly attempted to influence the grand jury. *Id.* at 631–33, 374 A.2d 1144. The *Bartram* Court quoted, with approval, from *United States v. Swift,* 186 F. 1002, 1018–19 (N.D.Ill.1911), and said:

The authorities cited by defendants, in which indictments were quashed because the accused was called before the grand jury and examined, or because private counsel was permitted to appear and address the grand jury, are not in

point. In those cases the indictments were quashed, not because incompetent evidence was received, but because the proceedings of the grand jury were unconstitutional and unlawful. Clearly, if the grand jury were improperly impaneled, or if certain classes of persons unlawfully were excluded from serving thereon, the matter could be brought to the attention of the court, and disposed of, by a motion to quash the indictment.

The two propositions are radically different. *It is one thing to quash an indictment because the accused, in violation of his constitutional right, is brought before the grand jury and browbeaten or maltreated, or because private counsel is permitted to harangue the jurors, or because other like fundamental wrongs are permitted, and quite another thing to quash an indictment because a witness is asked concerning facts which mayhap do not tend to prove the charge which the grand jury is to inquire into.* The one reaches to the organizational or fundamental power of the grand jury to act; the other, granting that the grand jury was properly impaneled and had the power to proceed, involves the proposition that *it acted upon incompetent evidence, and therefore reached an irrational conclusion.*
*Bartram,* 280 Md. at 625–26, 374 A.2d 1144 (emphasis added).

In *State v. Bailey,* 289 Md. 143, 149–50, 422 A.2d 1021 (1980), the Court noted that Maryland's appellate courts have been "steadfast" in holding that a motion to dismiss is not a proper vehicle for testing the admissibility of testimonial evidence at trial and that a defendant is not entitled to dismissal because the prosecution presented tainted evidence to the grand jury.

Appellant has directed our attention to several cases from sister jurisdictions where the courts have said that a prosecutor has an affirmative duty to present exculpatory evidence to the grand jury.[3] Three of those cases (*Frink v. State,* 597

---

**3.** Maryland Rules of Professional Conduct 3.8 sets forth the special responsibilities of a prosecutor. Subsection (d) provides that the prosecutor in a criminal case shall:

P.2d 154 (Alaska 1979); *Miles v. United States*, 483 A.2d 649 (D.C.1984); *State v. Moore*, 438 N.W.2d 101 (Minn.1989)), cite various versions of the ABA Standards for Criminal Justice as the basis for requiring the prosecutor to present exculpatory evidence to the grand jury. The 1980 ABA Standard provides: "No prosecutor shall knowingly fail to disclose to the grand jury evidence which would tend to substantially negate guilt." 1 *ABA Standards for Criminal Justice* § 3–3.6(b) (2d ed.1980).

While these rules and standards require the prosecutor to disclose evidence tending to negate guilt, the District Court in *U.S. v. Mandel*, 415 F.Supp. 1033 (D.Md.1976), explained:

> Only in a case in which the evidence clearly would have negated guilt or undermined the authority of the grand jury to act at all should a court act. Otherwise, a court runs the risk of interfering too much with the grand jury process and does so largely on the basis of guessing what evidence a grand jury might have found persuasive.

*Id.* at 1042. In the case at hand, the evidence withheld clearly would not have negated guilt.

The out-of-state cases cited by appellant are ones based on statutes peculiar to that jurisdiction or are from jurisdictions

---

(d) make timely disclosure to the defense of all evidence or information known to the prosecutor *that tends to negate the guilt of the accused or mitigates the offense* . . . .

Maryland Rule 3.8(d) (emphasis added). This rule follows verbatim ABA Model Rule 3.8(d). Explaining ABA Rule 3.8(d), one commentator discussed the prosecutor's duty to volunteer exculpatory evidence to the grand jury:

Whenever the prosecutor is proceeding *ex parte*, as in a grand jury hearing, the ethics rules provides that he should offer the tribunal "all material facts" whether or not adverse. On the other hand, as a matter of constitutional law, a court may not dismiss an otherwise valid indictment on the ground that the government failed to disclose to the grand jury "substantially exculpatory evidence" in its possession.

Ronald D. Rotunda, *Legal Ethics The Lawyer's Deskbook on Professional Responsibility* § 29–2.2 (ABA 2000) (citing ABA Model Rule of Professional Conduct 3.8(d)) (governing *ex parte* proceedings, including grand jury proceedings).

whose relevant common law appear to be different from Maryland's.[4]

Moreover, of the cases cited by appellant, only two actually dismissed the indictment based on the prosecutor's failure to present exculpatory evidence. *See Johnson v. Superior Court,* 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792, 796 (1975) (based on Cal.Penal Code § 939.7); *People v. Abbatiello,* 129 Misc.2d 831, 494 N.Y.S.2d 625, 627 (Sup.Ct.1985) (based on New York common law).[5] No case cited by the appellant has held that the prosecutor's failure to disclose exculpatory evidence to the grand jury *ipso facto* required dismissal of the indictment. In the cases cited by appellant, the courts appear to have adopted the view that in order to dismiss the indictment, the defendant must show that, given the totality of the evidence presented to the grand jury, the omitted evidence

---

**4.** Connecticut, Hawaii, and Massachusetts base the prosecutor's duty to present exculpatory evidence to the grand jury on their state's common law: *State v. Couture,* 194 Conn. 530, 482 A.2d 300, 315 (1984); *State v. Adams,* 64 Haw. 568, 645 P.2d 308, 311 (1982); *Commonwealth v. Mayfield,* 398 Mass. 615, 500 N.E.2d 774, 778 (1986). Seven cases cited by appellant were based on a state statute or rule: *Frink v. State,* 597 P.2d 154, 164 (Alaska 1979) (Alaska Criminal Rule 6(q)); *State v. Coconino County Sup. Ct.,* 139 Ariz. 422, 678 P.2d 1386 (1984), *rev'd on other grounds, Arizona v. Mauro,* 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (A.R.S. § 21–412 provides that grand jury *may* request exculpatory evidence); *Johnson v. Superior Court,* 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792, 796 (1975) (Cal.Penal Code § 939.7); *State v. Nordquist,* 309 N.W.2d 109, 118 (N.D.1981) (statute and common law); *State v. Harwood,* 45 Or.App. 931, 609 P.2d 1312, 1316 (1980) (statute and common law); *Strehl v. District Court,* 558 P.2d 597, 598–99 (Utah 1976) (statute and common law).

**5.** In *Abbatiello,* a judge on the Supreme Court of New York (a trial court) dismissed the indictment based on New York common law stating,

The court recognizes that the District Attorney is initially under no obligation to present exculpatory material at the Grand Jury level. Nor is there any precise formula to determine whether, and under what circumstances, a prosecutor must present exculpatory evidence to the Grand Jury. However, if the exculpatory matter is so important as to materially influence the Grand Jury's investigation, or its introduction would possibly cause the Grand Jury to change its findings, then it must be submitted.

*Abbatiello,* 494 N.Y.S.2d at 627 (citations omitted).

would likely have precluded the grand jury from arriving at a decision to indict the defendant. This is, of course, a very high standard. Appellant made no such showing; in fact, appellant does not even argue that this high standard was met. Thus, even if Maryland adopted the views espoused in the jurisdictions cited by appellant, it would be improper to dismiss appellant's indictment.

## III.

Appellant argues that "the trial court erred in refusing to strike for cause jurors aware of the fact that appellant had been suspected of killing Laura Houghteling, or who could otherwise not be impartial as a result of massive pretrial publicity concerning the Houghteling and Dorr cases." Appellant points to answers given by nine jurors, each of whom appellant claims should have been struck for cause.

Appellant's counsel was given twenty peremptory challenges but used only nineteen. By use of his peremptory challenges, none of the nine jurors actually served on the jury that convicted appellant. Therefore, even if we assume, *arguendo*, that the trial judge should have struck for cause one or more of the nine challenged jurors, that assumed error was waived. This principle was made clear in the case of *White v. State*, 300 Md. 719, 728–29, 481 A.2d 201 (1984), where the Court said: "If disqualification for cause is improperly denied, but the accused has not exercised all allowable peremptory challenges, there is no reversible error." Additionally, in *Parker v. State*, 227 Md. 468, 471, 177 A.2d 426 (1962), the Court stated, "[W]e think it is clear that the defendant (who had not exhausted his challenges) was not prejudiced"; *see Thomas v. State*, 50 Md.App. 286, 437 A.2d 678 (1981); *Earhart v. State*, 48 Md.App. 695, 429 A.2d 557 (1981); *McCree v. State*, 33 Md.App. 82, 363 A.2d 647 (1976).

## IV.

Appellant contends that the trial judge erred in admitting hearsay evidence during James Beckette's testimony.

■ As already mentioned, James Beckette testified that appellant confessed that he had killed Michelle Dorr. He also testified that, about eighteen months after appellant's confession, he read an article in *The Washington Post* magazine about the Michelle Dorr investigation and learned the names of the detectives who were in charge of the investigation. Shortly thereafter, he wrote a letter to two detectives mentioned in the article. On direct examination by the prosecutor the following occurred:

> Q. And in the letter that you wrote to Detective Mike Garvey and Sergeant Bob Phillips, did you tell them what you have told this jury today?
>
> MR. SALZMAN [Defense Attorney]: Objection.
>
> THE COURT: You can answer yes or no.
>
> THE WITNESS: Yes.

Appellant contends that the court erred when it allowed this answer because it was hearsay and comes within no exception to the rule barring admission of hearsay evidence. Appellant points out that "hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See* Md. Rule 5–801(c). "Statement" means "(1) an oral or written assertion or (2) non-verbal conduct of a person, if it is intended by the person as an assertion." *See* Md. Rule 5–801(a). When Mr. Beckette answered "yes" to the question at issue, he was testifying, in effect, to the following: In the letter that I wrote to Detective Garvey and to Sergeant Phillips, I told them the same thing that I have told you (the jury).

We agree that this statement is hearsay and comes within no hearsay exception.[6] But "error" for appellate purposes

---

**6.** In Joseph Murphy, *Maryland Evidence Handbook* section 700A (3d ed.1999), the author states:

> Prior statements made by the person who testified at trial continue to be treated as hearsay in Maryland. Under Md. Rule 5–802.1, however, when the out-of-court declarant testifies at trial, seven kinds of prior statements are admissible to prove truth of content: (1) prior inconsis-

"may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling. . . ." Md. Rule 5–103(a). Trial in this case lasted eighteen days. The fact that the witness's version of what appellant said did not vary was hardly surprising in that appellant said so little to Beckette when he confessed.

Moreover, almost all of the lay witnesses called by the State underwent cross-examination by the defense concerning inconsistencies between statements made pre-trial and their trial testimony. Under these circumstances, if the question calling for a hearsay answer had not been asked, the jury would have, in all likelihood, inferred that Beckette's statements were consistent by the mere fact that he was not cross-examined about any inconsistency.

Lastly, the fact that Beckette's letter was consistent with his trial testimony only marginally bolstered his credibility. Beckette, like all the "jailhouse witnesses," was attacked not because his memory was hazy, but because, according to appellant, he made up the stories about appellant's confession to win favor with the authorities who held him captive.

Under these circumstances, we hold that the admission of the objected-to "yes" answer by Beckette was harmless beyond a reasonable doubt.

### V.

Appellant contends that the trial judge erred in allowing Detective Garvey to read to the jury his notes from his interview of O'Neil Cammock on June 9, 1986—which we quoted verbatim in Part I. Appellant contends that those notes

---

tent statements made under penalty of perjury "at a trial, hearing, or other proceeding or in a deposition," (2) prior inconsistent statements reduced to writing and signed by the declarant—witness, (3) prior inconsistent statements contemporaneously recorded—in substantially verbatim fashion—stenographically or electronically, (4) prior consistent statements that rebut claims of improper motive or fabrication, (5) prior identifications, (6) the victim's (consistent) "prompt" complaint of *sexually* assaultive behavior, and (7) the declarant-witness's "past recollection recorded."

were hearsay and that the hearsay exception set forth in Rule 5–802.1(e) was inapplicable because Mr. Cammock never "adopted" the June 9, 1986, statement.

Rule 5–802.1(e) excepts from the hearsay rule:

A statement that is in the form of a memorandum or record concerning a matter about which the witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, if the statement was *made or adopted* by the witness when the matter was fresh in the witness' memory and reflects that knowledge correctly.

(Emphasis added.)

■ During the initial investigation, Mr. Cammock told police investigators that the man who allowed him to use the telephone at the Clark residence was accompanied by a "small white female" who was not Michelle. At trial, however, Mr. Cammock's testimony contained no reference to having seen a child in the Clark residence. Although he recalled talking with police, Mr. Cammock testified that he did not then remember seeing the child, but that whatever he said in the statement "was closer in my memory then."

When testifying at trial, Mr. Cammock also said that Garvey's notes were more accurate than his present memory (thirteen years later). And, while Detective Garvey admitted that he did not recall having shown Mr. Cammock the actual piece of paper upon which he had written his notes, he testified that after writing down what Mr. Cammock had said "we went back over it again verbally to make sure we had everything right."

Appellant focuses on the word "adopted" as used in Rule 5–802.1(e) and claims that Mr. Cammock's June 9, 1986, statement was not "adopted" by the witness when the matter was fresh and accurately reflected his memory. But, the rule requires the statement to have been "made *or* adopted" by the witness. The combined testimony of Detective Garvey and that of Mr. Cammock showed clearly that the out-of-court declarant (Cammock) *"made "* the statement ten days after

Michelle disappeared—when his memory was still clear and accurately set forth his earlier knowledge.

The trial court did not err in allowing Detective Garvey to read his notes to the jury because the requirements of Rule 5–802.1(e) were met.

## VI.

The State called as a witness Thomas Sheasley, a correctional case manager at the Maryland Department of Correction who was employed at a prison in Hagerstown, Maryland. In January 1998, Mr. Sheasley came to know appellant at the prison. The two sometimes played chess and enjoyed a friendly relationship.

At trial, Mr. Sheasley was asked by the prosecutor about three statements that were made by appellant in his presence. The first statement was made on October 27, 1998, during a meeting to review appellant's housing situation. The meeting was entirely voluntary on appellant's part and took place approximately one month after appellant had been indicted for the murder of Michelle Dorr.

During the meeting, a correctional officer who was present, a Lieutenant Anderson, asked appellant, in a "whimsical way" if he had killed "the girl." Appellant replied that "he could not speak about that." Another person in attendance at the meeting then asked appellant how the police had treated him during interrogation. According to Mr. Sheasley, appellant "sort of nodded" at the implication that he had been treated harshly by the Montgomery County police. Appellant then said that the police had not been honest and truthful with him; he next complained that the press, too, had lied about him. As an example of untruthful press coverage, appellant said, "[O]ne of the lies is that I was not living with my brother at the time she was killed." When Sheasley heard that remark, he looked at appellant and said, "Who ever said she was killed?" According to Sheasley, appellant then gave him a "cold hard stare."

■ Appellant filed a motion *in limine* to prevent the State from introducing testimony about appellant's having said that he "was not living with my brother at the time *she was killed.*" Counsel contended that the statement was one made by appellant when he was under "custodial interrogation" and should be excluded because he had not been given his *Miranda*[7] warnings.

■ Prison confinement does not necessarily equate with "custody" within the meaning of the *Miranda* decision. *Hamilton v. State,* 62 Md.App. 603, 611, 490 A.2d 763 (1985). We said in *Hamilton:*

> We must not forget that *"Miranda* ... was aimed not at self-incrimination generally ... but at *compelled* self-incrimination—the inherent coercion of the custodial, incommunicado, third degree questioning process." In other words, "[t]he purpose of *Miranda* was to ventilate the musty and at time mysterious precincts of the interrogation room by opening the door to a lawyer or at least apprizing the suspect fully of his legal rights in that regard." The *Miranda* Court, in deeming custodial interrogation as "inherently coercive," decried that "such an interrogation *environment* is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carried its own badge of intimidation."

Thus, we can see that it is the interrelationship of the examiner and the environment that creates the coercive *atmosphere*—that determines custody *vel non.* Although the environment here, a prison, leads us to thoughts of custody, there is nothing coercive whatsoever in the casual questioning by the informer Fowler (appellant's acquaintance or accomplice) who ostensibly was not a police interrogator, that would functionally or effectively subjugate appel-

---

7. *Miranda v. Arizona,* 384 U.S. 436, 467–69, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

lant to Fowler's will. Accordingly, the trial court committed no error in admitting these statements.

*Id.* at 616, 490 A.2d 763 (citations omitted).

The relevant factors to be considered in determining whether questioning is custodial were set forth in *Whitfield v. State*, 287 Md. 124, 141, 411 A.2d 415 (1980), a case that did not involve questioning while in prison. Those factors are: (1) the location and duration of the session, (2) how many police were present, (3) what was said and done, (4) whether the defendant was placed under actual physical restraint or whether there were "things equivalent" to actual restraint, such as drawn weapons or a guard at the door, (5) the manner in which the defendant arrived at the interview, and (6) whether he was detained or arrested or, instead, permitted to leave after the interview. *Id.* All of these factors are relevant to ascertaining the determinative factor, *i.e.,* whether the defendant, as a reasonable person, would have felt free to break off the questioning.

In this case, the meeting with Mr. Sheasley was one of several that appellant had attended in a regular series of housing reviews. The officials at the meeting were not police officers but merely state agents who were required to be present by administrative regulations. Appellant was free to attend or not to attend the administrative meeting, and at the conclusion of the meeting, he returned to his quarters in the prison. There was no indication that appellant, while at the meeting, was under "actual physical restraint" or "things equivalent," such as drawn weapons or a guard at the door.

Like the trial court, we find it of great significance that appellant had the option of attending or not attending the housing meeting. It is also significant that appellant, in fact, exercised his right to decline answering certain questions while at the meeting. Moreover, it is evident that appellant felt free to change the subject once he was asked a question that made him uncomfortable. *Miranda,* as we have seen, becomes applicable only when one's freedom of action, or one's freedom of movement, is curtailed to a degree that a reason-

able person would not feel free to break off questioning. Given the frequency and regularity of appellant's housing meetings, as well as the fact that his attendance was voluntary, and considering appellant did break off questioning as to at least one subject, appellant's freedom was not curtailed to the extent necessary to render him "in custody" within the meaning of *Miranda.* The trial judge did not err in allowing into evidence the statement "I was not living with my brother ... [when] she was killed." [8]

A second statement made to Mr. Sheasley was objected to at trial but was not mentioned in the motion *in limine.* The issue arose when Mr. Sheasley was asked about some notes he wrote concerning a conversation he had with appellant in November of 1998. Trial counsel for appellant made clear that he objected to Mr. Sheasley's testimony regarding the contents of the notes, but he did not object to the prosecutor asking leading questions in regard to what appellant had said. The following then transpired:

Q [PROSECUTOR]: Mr. Sheasley, did Mr. Clark stay [sic] to you, "I have two storage units. Well, there may be more"?

A [MR. SHEASLEY]: Yes.

Q: And then did he say, "I purposefully told you that because I want ... to keep you guessing"?

A: Correct.

Q: And did he then go on to say, "I don't want you to really know"?

A: Yes, he did.

---

8. Although the statement might conceivably be considered incriminating, it was easily explainable. Michelle had been missing for over twelve years when the statement was made, and by that time, most people (including Michelle's parents and the police) assumed the child had been killed by someone. Moreover, appellant had just been indicted for her murder. If he had chosen to answer Mr. Sheasley's question, "Who said she was killed?" he might well have said: "Michelle's mother, on a national television program" or "the Montgomery County Grand Jury."

Q: Okay. And did he then tell you that "It was like when I talked to the police. If they're going to play games with me, I'll play games with them"?

A: Yes. He made those statements.

Q: And what was Mr. Clark's demeanor during that conversation?

A: During that conversation, I would say typical, his typical demeanor. Perhaps a little agitated, but typical demeanor at that time.

On appeal, appellant contends that the trial judge erred in allowing this testimony because appellant was not advised of his *Miranda* rights prior to making the statements. This contention is without merit. At no point, either during direct or cross-examination, was it established that appellant divulged this information as a result of questioning. And, in order for the *Miranda* rule to apply, it must be established that the statements made by the suspect were made as a result of interrogation. *Whitfield,* 287 Md. at 142, 411 A.2d 415.

The prosecutor also asked Mr. Sheasley on direct examination what appellant had said to him about the "police efforts" in digging up or looking for Michelle Dorr's body. Mr. Sheasley answered that appellant told him that he could not understand why the police were searching for Michelle's body in the "New Jersey area." He also told Mr. Sheasley that "there was no need for the police to be digging in that area." This testimony was not objected to at trial; therefore, any objection to it was waived. *See* Md. Rule 2–517(a).

## VII.

One of the State's theories in this case was that appellant, on Saturday, October 31, 1992 (Halloween), went to the Well-fleet cemetery where his father and grandfather were buried, dug up the corpse of Michelle Dorr and took it elsewhere. According to the State's theory, appellant took these actions

because he realized at that point that the police were focusing on him as the person who had killed Michelle.

In support of this theory, the State produced a witness who had seen appellant at the cemetery on October 31st and saw him pull his truck up next to the Clark family grave markers. There was a shovel in the back of the truck at that time. Additionally, the State produced evidence indicating that appellant's truck had struck one of the grave markers directly across the road from the Clark family cemetery plot.[9] Moreover, according to the State's evidence, the ground near appellant's grandfather's grave had been disturbed between October 14, 1992, and January 3, 1993.

As mentioned earlier, Trooper Kathleen Barrett of the Massachusetts State Police Department testified that, on January 3, 1993, her German Shepherd dog, Dan, alerted at the areas of disturbed soil in the Clark family plot. Trooper Matthew Zarrella of the Rhode Island Police Department testified that his dog "Panzer" likewise alerted at the same spot in September 1995.

At trial, several questions asked by the prosecutor of Trooper Barrett and Trooper Zarrella were objected to by appellant's counsel. The trial judge overruled the objections, which appellant now contends was reversible error. The pertinent question asked of Trooper Barrett and her answer were:

Q [PROSECUTOR]: When the dog went to that particular spot [the area where the ground had been disturbed] and began to dig, what did that indicate to you as a trainer? . . . .

A: It indicated to me that he (Dan) had located one of three things that he was trained to locate under those circumstances, which is, human blood, human decomposition, and human tissue.

The objected-to questions addressed to Trooper Zarrella were quite similar, *viz:*

---

**9.** The State's theory was that appellant was backing up, after removing the body, when he struck the grave marker.

Q [PROSECUTOR]: ... [A]nd what did she [Panzer] do? How did she react?

A [TROOPER Zarrella]: She laid down.

Q: Okay. And what did that tell you?

A: She had discovered or detected the presence of human decomposition. She had detected the [sic] certain chemical byproducts that are present in human decomposition that we trained her to detect.

Troopers Barrett and Zarrella both admitted that cadaver dogs make mistakes, as do their handlers. For instance, a dog handler can "cue" a dog verbally or with body language. Also, in one case, unrelated to this one, Dan possibly made a false alert. It was not clear to Trooper Barrett, however, if Dan was mistaken because another cadaver dog alerted at the same spot as did Dan and because the crime lab had not yet completed its tests to determine if a piece of clothing found where Dan alerted contained human blood.

When counsel for appellant objected to the questions of the dog handlers concerning how they interpreted the "alerts" by their cadaver dogs, appellant's counsel said that the objections were on the same grounds as set forth in his unsuccessful pretrial motion *in limine.*

At the hearing concerning the motion *in limine,* appellant presented the testimony of Dr. Ann Marie Mires, the Director of the Identification Unit of the Boston Medical Examiner's Office, who qualified as an expert in the field of forensic anthropology and the identification of human remains. Dr. Mires has experience using dogs to locate human remains in cemeteries. In light of modern embalming and burial practices, she believed a properly trained cadaver dog would be able to distinguish a legitimate grave from a clandestine one within a cemetery because during embalming all body fluids are drained from the corpse, whereas persons who bury corpses in clandestine graves usually do not remove body fluids.

According to Dr. Mires, there are only three tools available to locate clandestine burials of human bodies: Trained cadaver

dogs, ground penetrating radar, and shovels. In Dr. Mires's opinion, the alert of a cadaver dog, standing alone, is not considered sufficient to show to a reasonable degree of scientific certainty that human remains are or were present at the location of the alert. After a cadaver dog alerts, digging or ground penetrating radar are used. But the fact that neither of these instruments reveals a body does not necessarily invalidate the cadaver dog's alert, because there is no chemical test yet devised that can confirm whether a body had once decomposed at a particular site. Dr. Mires is participating in the preliminary stages of scientific work to develop such a chemical test.

Dr. Mires testified that the use of cadaver dogs "in trying to determine the existence or the one-time existence of human remains at a particular location is a concept that is widely accepted in the forensic anthropology and pathology fields." Despite this reliance, a dog can falsely alert because water flowing from the site of a human cadaver may cause the dogs to alert at a place removed from the spot where a body was buried or because the dog is fatigued or because the handler misreads a dog's actions.

At the conclusion of the motion *in limine* hearing, defense counsel's argument was, in pertinent part, as follows:

> I think what the State is—one of the key points here that the State is missing is when Dr. Mires says, "Yes, these dogs are widely accepted as tools in this field of forensic anthropology," we all agree on that. So if they were just offering them as a tool, that would be acceptable.
>
> And they are a tool in the sense that just like the ... the drug detecting dogs are a tool and can be used to obtain probable cause to go search an area, what Dr. Mires explained was the dog is used as a tool in the sense that it focuses the investigators on where else to look, where to use in [sic] the ground penetrating radar to see if there is anything under there, and if the dog alerts, then you also know where to go to start digging with a shovel.

And so in that sense, they clearly are widely—I definitely agree that they are widely accepted in her field as a tool.

What they are not accepted as is proof-as being offered as proof that human remains were present in the absence of any physical evidence whatsoever that human remains were there. No clothing, no teeth, no skin, no bones, no hair, no fibers, no jewelry, nothing, no bags, no containers, no nothing. That is what is not accepted.

■■■ Appellant now contends that Trooper Barrett's and Trooper Zarrella's testimony regarding cadaver dogs was expert testimony. We agree. *See Terrell v. State,* 3 Md.App. 340, 346–51, 239 A.2d 128 (1968) (setting forth the requirements for the admission of evidence relating to tracking dogs). Appellant also alleges that Maryland Rule 5–702 is applicable. That rule reads:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriate-ness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Appellant does not question the qualifications of either trooper as a dog handler. He does contend, however, that there was insufficient factual basis to support the expert testimony of the dog handlers. Appellant argues:

[T]here was no corroboration for the alert; no body was found at the spot where the dog alerted. Dan's success record for detecting evidence of human remains was checkered, at best. Dr. Mires admitted that evidence of the alert of a cadaver dog was not enough, by itself, to prove the presence (or presence at some time in the past) of human remains, to a reasonable degree of scientific certainty. She admitted that the use of cadaver dogs to locate the fluids

that result from decomposition is a science that is in its preliminary stages; it is not yet fully accepted. Dr. Mires agreed with the prosecutor's characterization of the endeavor as "cutting edge." Accordingly, because the science itself is in such preliminary stages, and because there was no showing of the expertise of Dan, a factual basis was lacking, and the court erred in admitting the evidence.

We will take appellant's last point first, *i.e.*, that there was no showing of Dan's expertise. Prior to giving her expert testimony, Trooper Barrett testified that to become a cadaver dog the canine must go through seventeen weeks of "utility training," which covers article search, tracking, and "controlled aggression." If a dog successfully completes that course, certain elite animals are selected to become cadaver dogs. They then undergo additional training. According to Trooper Barrett, Dan was an apt pupil in that he was extremely independent, friendly, and had "phenomenal ball drive." [10] Trooper Barrett gave an example of Dan's success in finding cadavers. She testified:

> We were called to a residence. A female had been missing from [her] home. [She had been missing] ... for quite some time. We came into the house, the dog immediately went to the cellar, started to dig, ... knocking things over.

> We later found that this is where the body had actually been stored. We went up into the master bedroom, ... [and Dan] alerted ... on the wall, standing on the wall, and then he went into a small crawl space, and I lost sight of him.

> And he tried to come back but he was falling [through] ... the insulation.... And he came back; he had a garbage bag in his mouth, and in the garbage bag was the victim's

---

10. Police dogs who search for persons, cadavers, drugs, and so forth, are trained to try to find a ball. When, for instance, a dog is successful in finding a clandestine grave, the dog is rewarded by being given the ball. A dog who has no interest in finding a ball is not a good candidate for search training.

purse. And lab results indicated that there was body fluids....

As additional examples of Dan's expertise, Trooper Barrett said that Dan had located seven bodies that were under water. Once he alerted on a body that was in a stone quarry, 157 feet below the water's surface.

Dan has been certified as a qualified cadaver dog once a year since 1991 by the New England State Police Association (NESPA). He has also been certified as a cadaver dog once every two years since 1991 by the North American Police Work Dog Association. Testing for certification takes one week. In order to be certified, blood, tissue, o.· other human remains are hidden and the canine must find the hiding place. During certification, Dan never failed to find what was hidden. Moreover, he never, in training, alerted on "false holes," which are dug in attempts to deceive the dogs.

Based on all the above, we disagree with appellant's contention that the State failed to show Dan's expertise.[11] It is true, as appellant points out, that Dr. Mires testified at the motion *in limine* hearing that the fact that a cadaver dog alerted at a certain spot was "not enough by itself" to prove the presence (or presence at some time in the past) of human remains to a reasonable degree of scientific certainty. But here, the alert by Dan at the spot in the Clark family graveyard did not stand alone. Other circumstantial evidence pointed to the fact that there had been a clandestine burial at that spot, *i.e.*, the fact that the Clark plot had been disturbed between October 14, 1992, and January 3, 1993, that appellant was present with his truck and shovel at the grave site on October 31, 1992, that a second cadaver dog alerted at the same spot two and one-half years after Dan's alert, and that the spot where the cadaver dogs alerted matched the spot, marked by an asterisk found on a map in appellant's truck on

---

11. Appellant did not challenge Panzer's expertise. Interestingly, when Michelle's body was found post trial, Panzer alerted to the spot where she was buried.

October 24, 1992. Under all these circumstances we believe that there was adequate foundation for the admission of the testimony regarding the officers' interpretations of the actions of Dan and Panzer.[12]

Appellant also argues that the evidence regarding the alerts by the cadaver dogs was inadmissible because "it was unreliable" under *Frye/Reed*[13] and Maryland Rule 5–702.

In support of that argument, appellant says:

The process of training dogs to alert on the products of decomposition, as opposed to training them to alert on cadavers themselves, is not generally accepted within the scientific community, and accordingly, it does not meet the standard set forth in Md. Rule 5–702 or in the *Frye/Reed* cases. As argued *supra,* Dr. Mires admitted that research into this training and use of dogs is in the preliminary stages, and is not yet fully accepted. It is not sufficient to show, to a reasonable degree of scientific certainty, that human remains are or have been present. Since this technique for finding and identifying soil in which human remains were once present is not generally accepted by the scientific community, the judge erred in admitting evidence relating to it.

That argument is based on a false premise, *i.e.,* that Dr. Mires "admitted that research into [the] . . . training and use of dogs is in the preliminary stages, and is not yet fully accepted." Dr. Mires never testified that research that delves into the training and use of cadaver dogs is in the preliminary stages.

---

**12.** As mentioned earlier, appellant contends that "Dan's success records for detecting evidence of human remains was checkered, at best." That contention has never been proven. On the one occasion when Dan and another dog alerted at a hole where no human remains were immediately observable, police found a pair of sweatpants. According to Trooper Barrett's trial testimony, although no blood or human tissue had been yet found, the police lab was checking the sweatpants to find out if they contained blood, tissue, or evidence of human decomposition. Those tests were not complete as of the date she testified.

**13.** *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923); *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978).

What was, according to her testimony, in the "preliminary stages" was her own work in attempting to discover a way of detecting fat, muscle, liquid, and other human byproducts that are deposited in the soil when a human body is decomposing. And, as already mentioned, Dr. Mires said that the use of cadaver dogs in trying to determine the existence, or the one-time existence, of human remains at a particular location is a widely accepted practice in the fields of forensic anthropology and pathology. Under these circumstances, the *Frye/Reed* test was met.

## VIII.

Appellant gave a statement to the police on September 23, 1998, without an attorney present. In that statement, he did not admit that he had any role in the disappearance of Michelle Dorr. He made statements, however, that were somewhat incriminating. Appellant contends that the motions judge erred in failing to suppress the September 23, 1998, statement. Two grounds are advanced in support of that argument.

Appellant first contends that his September 1998 statement was involuntary. Second, he maintains that the dictates of the *Miranda* decision were not met because appellant asked for an attorney in 1992 when he was first interrogated by the police but was never supplied with counsel during his September 23, 1998, interrogation.

### A. *Involuntariness*

As mentioned earlier, on November 6, 1992, appellant was interrogated by several Montgomery County police officers, including Detective Edward Tarney. During that interrogation, appellant repeatedly asked for the assistance of counsel. His requests were denied. Moreover, appellant was physically abused by the police in that interview. The State concedes that the interrogation in 1992 was improper. This concession is well founded. Judge Weinstein, a capable and experienced jurist, described that interrogation as "the worst I have ever seen." Appellant argues that the involuntary na-

ture of his 1992 statement "carried over" to and tainted the interrogation that took place on September 23, 1998.

At the suppression hearing, appellant testified that in 1998 Detective Edward Tarney transported him from his place of incarceration in Hagerstown to Montgomery County. According to appellant, prior to his ride to police headquarters in Rockville, Detective Tarney searched him roughly, threw appellant's hat on the ground, hit him in the groin, spoke to him in a "strict" voice, and then

> looked at me like well, like, ah, like he—like what happened in '92, he was going—he—I was going to get the same treatment like I got in '92.

According to appellant, when he complained that his handcuffs were too tight, Detective Tarney said, "You'll have to talk to us if you want them loosened." Detective Tarney did, however, relent and loosen the handcuffs. Appellant further testified that he did not want to talk to the police at all in 1998 but felt that he was "going to go through the same thing ... [I had gone through] in 1992." Appellant admitted that nothing in the videotape of the 1998 interrogation showed that he was uncomfortable because of the (alleged) physical abuse by Detective Tarney.

Dr. Neal Blumberg, Director of Forensic Evaluation at Spring Grove Hospital Center, testified at the suppression hearing that appellant had been diagnosed with continuous schizophrenia of the paranoid type since approximately 1994. He described the condition as:

> [A] major mental illness characterized by a deterioration in the individual's level of functioning usually sometime in the late teens or early adult years ... the individual becomes more withdrawn, begins to develop some odd thinking, odd behavior.
>
> It eventually progresses to the point where they have active psychotic symptoms, such as delusions or hallucinations or disorganized or confused thinking. This is a biological illness that affects brain functioning....

The course of the illness can vary somewhat, but for the most part, once you have entered the active phase, unless there's some intervention, you're going to have abnormalities in the thinking process, in the thought content, in the different types of emotional responses that can be generated.

He further testified that appellant's condition was not easily differentiated from two other psychiatric illnesses—schizo— affective disorder and major depression with psychotic features, especially those involving persecutory delusions.

Blumberg viewed videotapes of both the 1992 and 1998 police interrogations, then met with appellant on April 16, 1999, and heard appellant's description of how Detective Tarney acted. Blumberg concluded that being put in the same interrogation room as the one police had used in 1992 would "have the impact, in my opinion, of reminding him of what he went through." In a patient with post-traumatic stress disorder, this would generate "a reaction of fearfulness, of heightened anxiety, flashbacks, nightmares of the traumatic experience." While Blumberg acknowledged that post-traumatic stress disorder was not appellant's diagnosis, he believed nevertheless that the police actions "all appear to have the impact of reminding him what he went through, of trying to re-induce the state of helplessness, of fearfulness, that he had been going through at the time of the '92 interview."

Given the existence of police conduct "geared to remind him of what he went through and to hopefully have an influence for him to talk with them," Blumberg concluded that appellant's decision to say anything at all to police was involuntary. He conceded that it was apparent from the videotape that appellant understood the *Miranda* warnings but opined that comprehension of the warnings and the mental state required for a voluntary decision to waive *Miranda* rights were "two separate issues."

Despite appellant's testimony and that of Dr. Blumberg, the trial judge rejected appellant's contention that the 1998 statement was involuntary. Judge Weinstein said:

With respect to the motion to exclude the tape of '98, I have watched the tape. I observed Mr. Clark during the playing of the tape. I will state for the record that factually that [sic] is absolutely nothing that I could see in that videotape that would indicate to me as the trier of fact that there is anything that Mr. Clark did in that '98 tape that was influenced by his '92 interrogation.

Everything he did was voluntary. He was given his *Miranda* warnings. He knew of his right to counsel. He did not ask for a lawyer. He specifically said to the detectives, "I will talk to you. I don't want a lawyer."

During the interrogation, he was selective in answering the questions. He was quite cognizant of the questions that were asked of him. He answered only those questions that he wanted to answer.

I can find nothing in that tape or anything that has been presented to me today that would indicate that would [sic] he did there was other than voluntary.

 In reviewing the denial of appellant's motion, we extend great deference to the suppression court's fact-finding, particularly the lower court's ability to determine the credibility of the witnesses and to weigh and determine first-level facts. *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). When conflicting evidence is presented, we accept the facts as found by the suppression court, unless clearly erroneous, and we review the evidence in the light most favorable to the prevailing party. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990). After giving due regard to the suppression court's findings of fact, we then make our own independent appraisal by reviewing the law and applying it to the facts of the case. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992).

We have reviewed both the transcript of the suppression hearing and the videotape of the 1998 interrogation. *See Walker v. State,* 125 Md.App. 48, 54–55, 723 A.2d 922 (1999) (discussing use of videotape by this Court). Based on that review, we find that, while appellant's behavior and demeanor

on the videotape were at times somewhat unusual, there is no indication of fearfulness or anxiety. Significantly, appellant's demeanor did not change when he was asked if he knew where he was and whether he remembered the room he was in. He answered calmly that he did not remember the room but remembered one that looked like it, but it was bigger and had the mirror and door in different places. Nor did his demeanor change when he was asked whether he remembered Detective Tarney. He replied, "I remember you very well. I remember someone else."

The following colloquy then took place:

Q: We got rid of him.

A: He retired. It was in the paper.

Q: Well I don't think he treated you very well.

A: Well I don't think so either.

\* \* \*

Q: What do you think of him?

A: I forgive him. . . . I forgive you too. Just doing your job.

As Judge Weinstein pointed out, during interrogation, appellant elected to answer some questions, but refused to answer others, referring to advice previously received from his lawyer. We agree with the suppression court characterization of his demeanor during interrogation as "awfully calm" and see nothing in the videotape to contradict defense counsel's admission at the suppression hearing that appellant's intelligence was above average. Dr. Blumberg himself acknowledged that at several points on the 1998 videotape appellant indicated a belief that he could choose whether to answer questions, relying on legal advice as a ground for refusing to answer certain questions, telling police that if they asked a stupid question they would get a stupid answer, and by saying that he was trying to help out by answering questions even though he did not have to.

Given these circumstances, we hold that the suppression court did not err when it found that appellant's statement was voluntary.

## B. *Request for Counsel*

As an alternative ground for suppressing the September 1998 statement, appellant contends that, because he asked for counsel in 1992 during police questioning, the police were not allowed to *resume* questioning in 1998, because: (1) he never reinitiated further communication with the police and (2) during the reinterrogation counsel was not present. In support of this contention, appellant relies on *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and its progeny. The Supreme Court held in *Edwards* that once a suspect invokes his *Miranda* right to counsel, all interrogation must stop unless the defendant initiates further communication; if the police, rather than the suspect, initiate further communication, any waiver of the right to counsel is invalid. *Id.* at 484–85, 101 S.Ct. 1880.

In *Edwards,* the suspect was read his *Miranda* rights but, after briefly speaking with the police, asked for an attorney. *Id.* at 478–79, 101 S.Ct. 1880. Police questioning then temporarily ceased. The next day the suspect was reinterrogated by different police officers after he was again advised of his *Miranda* rights. *Id.* at 479, 101 S.Ct. 1880. The defendant waived his *Miranda* rights and then gave the police an incriminating statement. *Id.* The statement was admitted at trial, and ultimately the Arizona Supreme Court affirmed Edwards's conviction. The United States Supreme Court reversed, holding that the use of defendant's confession against him at trial violated his right, under the Fifth and Fourteenth Amendments, to have counsel present during custodial interrogation. *Id.* at 487, 101 S.Ct. 1880.

Approximately seven years after *Edwards,* the Supreme Court decided *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). In that case, the defendant (Roberson) was arrested at the scene of a burglary on April 16, 1985. After being advised of his *Miranda* rights, Rober-

son told the police that he wanted a lawyer present before he answered any questions. *Id.* at 678, 108 S.Ct. 2093. Questioning then ceased. *Id.* Three days later, when Roberson was still in jail, a different police officer interrogated him about a different burglary. *Id.* That officer, unaware that the defendant had previously invoked his right to counsel, questioned Roberson after the latter had been advised of, and waived, his *Miranda* rights. *Id.* The officer then obtained an incriminating statement from Roberson about a burglary that occurred one day prior to the burglary for which he was arrested initially. In *Roberson,* the Court ruled that the *Edwards* prohibition against reinterrogation applied even if the reinterrogation was unrelated to the crime that was the focus of the original questioning, and even if the officer who conducts the reinterrogation was unaware that the suspect had previously requested counsel. *Id.* at 680, 108 S.Ct. 2093. The Court emphasized:

> T[o] a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling.... Especially in a case such as this, in which a period of three days elapsed between the unsatisfied request for counsel and the interrogation about a second offense, there is a serious risk that the mere repetition of the *Miranda* warnings would not overcome the presumption of coercion that is created by prolonged police custody.

*Id.* at 686, 108 S.Ct. 2093.

In *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Court expanded the *Edwards* rule still further. Robert Minnick escaped from a Mississippi prison and was apprehended in California. *Id.* at 148, 111 S.Ct. 486. One day after his arrest, on Friday, August 22, 1986, two FBI agents interviewed Minnick after first giving him his *Miranda* warnings. *Id.* Minnick refused to sign a waiver form and told the agents that he would not answer "very many" questions. *Id.* Minnick proceeded to recount an incomplete and somewhat

self-serving story about his participation in two murders that occurred on the day following his prison escape. *Id.* Minnick then invoked his right to counsel by telling the FBI agents to "come back Monday when I have a lawyer." After the FBI interview, Minnick spoke with a court-appointed lawyer, but subsequently, on Monday, August 25, 1986, he was reinterrogated by a deputy sheriff from Mississippi, without counsel being present. *Id.* at 149, 111 S.Ct. 486. Minnick was once again given his *Miranda* warnings, whereupon he gave the deputy sheriff a more detailed account of the murders. *Id.* At Minnick's trial, the statement he gave to the deputy sheriff was introduced into evidence; Minnick was later convicted of the murders and sentenced to death. *Id.* at 149, 111 S.Ct. 486. On appeal, Minnick argued that the statement he gave to the deputy sheriff should have been excluded based on *Edwards.* *Id.* at 149–50, 111 S.Ct. 486. The Supreme Court agreed, even though Minnick had spoken with counsel prior to giving his statement to the deputy sheriff. *Id.* at 154, 111 S.Ct. 486. The Court, citing *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), said that the rule in *Edwards* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Id.* at 150–51, 111 S.Ct. 486. The Court went on to say that the "rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures. *Edwards* conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of *Miranda* . . . ." *Id.* In *Minnick,* the Court interpreted *Edwards* (and later cases) "to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning." *Id.* at 153, 111 S.Ct. 486.

Since *Minnick,* there has been considerable discussion and disagreement among legal scholars as to whether there are, or at least should be, any exceptions to the seemingly "bright-line" *Edwards* rule. *See, e.g.,* Eugene Shapiro *Thinking the Unthinkable, Recasting the Presumption of Edwards v. Arizona,* 53 Okla. L.Rev. 11 (2000); Laurie Magid, *Questioning*

*the Question–Proof Inmate: Defining Miranda Custody for Incarcerated Suspects,* 58 Ohio St. L.J. 883, 932 (1997); Marcy Strauss, *Reinterrogation,* 22 Hastings Const. L.Q. 359, 386–92 (1995); Elizabeth E. Levy, *Note, Non–Continuous Custody and the Miranda–Edwards Rule: Break in Custody Severs Safeguards,* 20 New Eng. J. on Crim. & Civ. Confinement 539, 556 (1994); Jeffrey Richardson, *It's Not Easy Being Green: The Scope of the Fifth Amendment Right to Counsel,* 31 Am. Com. L.Rev. 145 (1993). Among the issues that have arisen post *Edwards* is whether the rights protected by *Edwards* are "time tethered" or, put another way, whether, unless counsel is present, a suspect who has invoked his rights to counsel is forever protected from police-initiated questioning. These last-mentioned issues were presented when the Supreme Court heard oral argument in *United States v. Green,* 592 A.2d 985 (D.C.App.1991), *cert. granted,* 504 U.S. 908, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992), 507 U.S. 545, 113 S.Ct. 1835, 123 L.Ed.2d 260 (1993), *vacating order granting cert.* Arguments heard, 52 Crim. L.Rev. (BNA) 3096–97 (Nov. 30, 1992).

*Green* involved the propriety of police-initiated reinterrogation that took place in a juvenile facility some five months after the suspect had invoked his right to counsel. 592 A.2d at 986. The suspect (Lowell Green) confessed to murder during the reinterrogation. Although the suspect was advised of and waived his *Miranda* rights prior to reinterrogation at the juvenile facility, the District of Columbia Court of Appeals affirmed the trial judge's suppression of the defendant's confession based on the *Edwards* rule. Despite granting *certiorari* in *Green,* the Supreme Court never decided the case because Green was murdered about four months after oral argument. *See* Richardson, 31 Am.Crim. L.Rev. at 145–46.

*Green* had invoked his right to counsel regarding the crime of possession with intent to distribute a controlled dangerous substance. 592 A.2d at 985. Prior to the reinterrogation that resulted in his confession to the crimes of robbery and murder, Green pled guilty to a reduced charge of "attempted possession with the intent to distribute cocaine." *Id.* at 986. When the police reinterrogated Green, he had not yet been

sentenced for the drug offense. *Id.* The question before the Court in *Green* was whether law enforcement personnel should be allowed to re-initiate interrogation with a suspect who had invoked his right to counsel five months earlier in connection with an unrelated offense where the suspect had pled guilty to the unrelated offense prior to reinterrogation.

At oral argument in *Green,* a number of justices asked questions that indicated their concern about the duration of Green's question-proof status after he invoked his right to counsel. *See* Magid, 58 Ohio St. L.J. at 890–91.

> [J]ustice White asked the government whether it would matter if the defendant had been questioned just a day after his invocation. Justice O'Connor also asked questions about the timing of questioning and tried to determine whether it mattered if the questioning occurred after "three months," "two months," "one month," or "two days." She also asked about the questioning of a defendant serving a life sentence. Finally, she asked whether sentencing should be an event that ends the question-proof status by ending the *Edwards* presumption of non-waivability of the right to counsel. The government virtually conceded that Green had been in continuous custody and the Court did not expressly question the litigants about whether continuous incarceration is per se continuous custody for *Miranda* purposes.

*Id.* at 890 n. 17 (citations omitted).

It has been suggested that the Court granted *certiorari* in *Green* because of the "absurd" result created by the unlimited duration of a suspect's question-proof status. *See* George E. Dix, *Promises, Confessions, and Wayne LaFave's Bright Line Rule Analysis,* U. Ill. L.Rev. 207, 231 n. 114 (1993). Others, however, contend that regardless of why *certiorari* was granted, the Supreme Court should, in the next case involving facts similar to those in *Green,* hold that neither "the passage of time nor the entering of a guilty plea should end the *Edwards* presumption arising from a request for counsel." *See, e.g.,* Richardson, 31 Am.Crim. L.Rev. 145, 158.

In *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), Justice Scalia, for the Court,

indicated, *in dicta,* that a break in custody would create an exception to the *Edwards* rule that once a suspect asked for counsel police-initiated reinterrogation could not be commenced without counsel being present.[14] Federal and state courts have unanimously accepted the view that the *Edwards* prohibition against reinterrogation is inapplicable if, after a suspect asks for counsel, there is a break in custody before reinterrogation commences. *See U.S. v. Harris,* 221 F.3d 1048, 1052–53 (8th Cir.2000); *Kyger v. Carlton,* 146 F.3d 374, 380–81 (6th Cir.1998); *United States v. Barlow,* 41 F.3d 935, 945–46 (5th Cir.1994); *United States v. Hines,* 963 F.2d 255, 257 (9th Cir.1992); *Dunkins v. Thigpen,* 854 F.2d 394, 397 (11th Cir.1988); *McFadden v. Garraghty,* 820 F.2d 654, 661 (4th Cir.1987); *United States ex rel. Espinoza v. Fairman,* 813 F.2d 117, 125–26 (7th Cir.1987) (dictum); *United States v. Skinner,* 667 F.2d 1306, 1309 (9th Cir.1982); *Commonwealth v. Galford,* 413 Mass. 364, 597 N.E.2d, 410, 414 (1992); *Willie v. State,* 585 So.2d 660, 666 (Miss.1991) (dictum); *People v. Trujillo,* 773 P.2d 1086, 1092 (Colo.1989); *In re Bonnie H.,* 56 Cal.App.4th 563, 65 Cal.Rptr.2d 513, 526 (1997); *Commonwealth v. Wyatt,* 455 Pa.Super. 404, 688 A.2d 710, 712–13 (1997); *Keys v. State,* 606 So.2d 669, 672 (Fla.Dist.Ct.App. 1992); *State v. Byrnes,* 258 Ga. 813, 375 S.E.2d 41, 41–42 (1989); *State v. Kyger,* 787 S.W.2d 13, 25 (Tenn.Crim.App. 1989); *In re Wells,* 532 So.2d 191, 196 (La.Ct.App.1988).

▪ Inasmuch as there is a universally recognized "break-in-custody" exception to *Edwards,* the question becomes

---

**14.** Justice Scalia said:

> In *Edwards v. Arizona,* we established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," which means, we have most recently held, that counsel must be present. If the police do subsequently initiate an encounter in the absence of counsel (*assuming that there has been no break in custody* ), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.
>
> (Emphasis added.)

whether there has been a "break in custody" when a suspect invokes his right to counsel, but later pleads guilty, is sentenced, and is serving that sentence in prison prior to reinterrogation by the police. The answer to that question is subject to strongly differing views as seen by the majority and dissenting opinion in *Kochutin v. Alaska*, 813 P.2d 298 (Alaska Ct.App.1991).

Jacob Kochutin was suspected of sexually abusing and murdering a seven-year-old boy (referred to as T.T.) who disappeared in June of 1984. *Id.* at 300. While Kochutin was in jail, on unrelated charges, T.T.'s body was discovered (in July 1985) in a trunk in Kochutin's uncle's home. *Id.* A state trooper wanted to question Kochutin about T.T.'s murder, but in August 1985, Kochutin's counsel told the state trooper that his client did not want to talk to the police without counsel being present. *Id.* One year later, while Kochutin was still incarcerated for an unrelated offense, the police conducted a series of interviews with him. The interviews took place between August 13 and August 20, 1986. On August 13, Kochutin was advised of, and waived, his *Miranda* rights. *Id.* at 301. In the August 1986 police interviews, Kochutin admitted that he sexually molested and murdered T.T. *Id.* At trial, Kochutin's statements were admitted into evidence, but on appeal, Alaska's intermediate appellate court reversed. *Id.* at 308. The *Kochutin* majority, basing its opinion on the belief that appellant had been in continuous custody between the time he invoked his right to counsel and the date of reinterrogation, said:

> The state further argues, however, that even if *Edwards* is not narrowly read, it remains inapplicable to Kochutin's case. According to the state, *Edwards* applies only to suspects who remain in continuous custody after making an initial request to consult with counsel. The State points out that in Kochutin's case, the challenged interviews occurred a full year after Morse [Kochutin's attorney] had asserted Kochutin's right to remain silent; although Kochutin was technically still in custody, he was apparently confined as a sentenced prisoner serving a term for unrelated offenses.

Kochutin was not in detention for T.T.'s homicide, and the district attorney took the precaution of ascertaining that he had no other cases pending. The state contends that Kochutin's status as a sentenced prisoner and the amount of time that elapsed after he invoked his right to remain silent removed his case from the *Edwards* rule.

Although the dissent in this case finds the state's argument persuasive, we do not. The United States Supreme Court made it clear in *Minnick* that *Edwards* adopted a "bright-line" rule that can be easily understood and predictably applied. Exceptions to the *Edwards* rule should not be carved out lightly. The exception to *Edwards* that the state proposes in this case is simply an argument that *Edwards* ought not to apply to Kochutin's situation, even though Kochutin undeniably invoked his *Miranda* rights and was thereafter subjected to police-initiated custodial reinterrogation without counsel present. This type of fact-specific analysis is precisely the type of uncertain case-by-case adjudication that the bright-line rule in *Edwards* is meant to avoid.

Moreover, the state's proposed *Edwards* exception presupposes that the *Edwards* rule applies only to suspects who remain in continuous custody after invoking their *Miranda* rights. The "continuous custody" requirement that the state relies on appears to have first been articulated by the court in [*U.S. ex. rel. Espinoza v.] Fairman*, [813 F.2d 117,] 124–27 [ (7th Cir.1987) ]. Although, as the dissent in this case notes, this requirement seems to have been generally accepted by federal appellate courts, it has never been definitively ruled on by the United States Supreme Court, and was not expressly adopted in *Edwards*.[15]

In any event, Kochutin actually did remain in continuous custody between August of 1985, when he first invoked his

**15.** After the original opinion in *Kochutin* was published, the rule was adopted by the *Kochutin* court after it was discovered that there had been a break in custody due to the fact that Kochutin had been out of jail between the time he asked for counsel and his reinterrogation.

*Miranda* rights, and August of 1986, when Stevenson contacted him at the Sixth Avenue jail without notifying Morse. Not only did Kochutin remain continuously in custody, but the subject of the police-initiated questioning in Morse's absence was precisely that to which Kochutin originally invoked his *Miranda* rights.

We find nothing in *Edwards* or in subsequent decisions of the Supreme Court to indicate that *Edwards* should be relaxed by the mere passage of time. Nor are we persuaded that Kochutin's status as a sentenced prisoner removes his case from coverage of the *Edwards* rule. The fact that Kochutin was not being detained in connection with T.T.'s homicide seems immaterial, since the United States Supreme Court has made it clear that *Edwards* applies even when police seek to question a suspect about charges other than those for which the suspect was arrested and as to which the suspect first invoked the right to remain silent. As evidenced by the fact that the troopers deemed it necessary to advise Kochutin of his *Miranda* rights, the interviews that occurred at the Sixth Avenue jail and at trooper headquarters in August of 1986 plainly amounted to custodial interrogation. Under the circumstances, it appears that the *Edwards* rule was applicable. Under *Edwards*, the police-initiated interviews were impermissible because they occurred without notice to Morse and without Morse's presence. As a result, Kothutin's apparent willingness to waive his *Miranda* rights is inconsequential.

*Id.* at 304–05 (footnote omitted) (some citations omitted).

In a dissenting opinion, Chief Judge Bryner disagreed:

---

*Kochutin v. Alaska*, 875 P.2d 778, 779 (Alaska Ct.App.1994). The court vacated its previous judgment, and explained:

> The continuous custody requirement has been universally recognized by federal courts of appeal and appears to be a well-established feature of the *Edwards* rule. Kochutin offers no cogent legal or factual reasons warranting rejection of the requirement in his case. Given the now undisputed break in custody that occurred in this case, Kochutin's August 1986 police interviews did not violate the *Edwards* rule.

*Id.*

In recognition of *Miranda*'s underlying purposes, however, the Supreme Court has made it plain that *Miranda* ceases to apply when custody occurs in the absence of inherent coercion. As the Court concluded in [*Illinois v.]* *Perkins,* [496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990)]: "We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." *Id.*

When a person is confined in custody solely as a sentenced prisoner, with no charges pending, the issue of guilt resolved by a final verdict, and the terms and conditions of future confinement clearly defined in a written judgment that is a matter of public record, the anxiety and uncertainty that support *Miranda*'s finding of inherent coercion simply cease to exist. When custody is not related to any pending or unresolved matter, it seems to me that there is little cause for concern that a police officer will "appear to control the suspect's fate," [*i]d.* at least in the absence of a showing that the officer's conduct somehow creates an atmosphere of custody going beyond that to which the suspect is accustomed in his normal setting. *See, e.g., Skinner,* 667 F.2d at 1308–09.

If it is safe to say under existing case law that a sentenced prisoner cannot automatically be deemed to be in continuing *Miranda* custody, then it is equally safe to say that a sentenced prisoner who invokes the right to counsel upon being interrogated under circumstances amounting to *Miranda* custody and is thereafter returned to normal sentenced—prisoner status should not automatically be deemed to be in continuous custody under *Edwards.* Once returned to the ordinary routine of other sentenced prisoners—without any vestige of the inherently coercive circumstances incidental to custodial interrogation—the prisoner should be treated, for *Edwards* purposes, in the same manner as any person who has been arrested, questioned in custody, and released.

Kochutin was serving a sentence for unrelated crimes when T.T.'s body was discovered. As an obvious focus of suspicion, he was twice transferred to more secure and restrictive confinement. Kochutin's changed status could well give rise to the type of anxiety and uncertainty contemplated by *Miranda*, and consequently, any attempt to question Kochutin while he was in administrative segregation would have amounted to custodial interrogation. For this reason, when Kochutin consulted with his attorney and invoked his *Miranda* rights through him, Kochutin was certainly in *Miranda* custody.

From the limited record in this case, it is uncertain precisely when Kochutin's *Miranda* custody ended. It is nonetheless clear that at some point during the fall of 1985—by December at the latest—Kochutin was released from administrative segregation and returned to regular, sentenced-prisoner status at the Hiland Mountain Correctional Center. From that point, so long as Kochutin remained incarcerated solely as a finally convicted, sentenced prisoner, he was no longer in *Miranda* custody. In the absence of evidence suggesting that Kochutin's return to sentenced-prisoner status was a ruse to allow further police contact, *Edwards* no longer precluded police-initiated contact in the absence of counsel.

Admittedly, *Edwards* was meant to adopt a "bright-line" rule that could be applied consistently and predictably; the case could thus conceivably apply to Kochutin's situation, even though neither logic nor common sense seem[s] to compel that result. In my view, however, *Edwards'* bright-line is not a laser, burning inexorably through form and substance into infinity. When the factual circumstances of a case fall into a predictable, potentially recurring pattern to which the underlying policy of *Miranda* and *Edwards* cease to apply, then so too does the bright-line of *Edwards* cease to shine.

*Id.* at 309–11 (footnotes omitted).

Reasoning similar to that utilized by Chief Judge Bryner's dissent was recently applied in *U.S. v. Arrington*, 215 F.3d 855

(8th Cir.2000). In *Arrington*, the defendant was charged by Minnesota authorities with felony firearm possession and fleeing police. *Id.* at 856. At the police station, the defendant, after being advised of his *Miranda* rights, requested counsel, and counsel was provided. *Id.* Thereafter, the defendant pled guilty in state court to the charge of fleeing the police, and the firearm charge was dropped. *Id.* The defendant was sentenced and began serving his state sentence. *Id.* Shortly thereafter, however, the defendant was arrested (while in jail) by an Alcohol, Tobacco and Firearms (ATF) agent on a federal felon in possession of firearm charge. *Id.* The defendant was again advised of his *Miranda* rights, which he waived. *Id.* Arrington then gave an incriminating statement to an ATF agent. *Id.* He was subsequently convicted by a jury on the federal firearm charge. *Id.*

On appeal, Arrington contended that the statement he gave to an ATF agent should have been suppressed based on *Edwards* and *Arizona v. Roberson*. *Id.* The Eighth Circuit Court of Appeals summarily rejected Arrington's contention as follows:

> We agree that *Edwards* and *Roberson* mandate that "after a person in custody has expressed his desire to deal with the police only through counsel, he 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police,' " *Roberson*, 486 U.S. at 682[, 108 S.Ct. 2093], and that this rule applies "whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation," *id.* at 687[, 108 S.Ct. 2093]. Although the Fifth Amendment right to counsel continues throughout the duration of police custody, *see Butler v. Aiken*, 846 F.2d 255, 258 (4th Cir.1988), we find no support in *Edwards* or *Roberson* for Arrington's contention that the right also "continues *ad infinitum*," and certainly not where, as here, the accused has entered a guilty plea and has begun serving his sentence. *United States v. Hall*, 905

F.2d 959, 963 (6th Cir.1990) (*Edwards* and *Roberson* do not give unlimited blanket protection to defendant invoking Fifth Amendment right to counsel). When Arrington was arrested on state charges, he validly invoked his Fifth Amendment right to counsel and that right was scrupulously honored throughout the state proceedings. After pleading guilty to the state flight charge, Arrington was transferred from police custody to correctional custody to serve his sentence. At that point, Arrington was no longer " 'in custody' as that term has been used in the context of *Edwards* and *Roberson,*" *id.* at 962, and *Edwards* and *Roberson* were no longer applicable as a basis for suppressing Arrington's statement to the ATF agent, *see McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (break in custody makes *Edwards* inapplicable); *Holman v. Kemna,* 212 F.3d 413, 2000 U.S.App. LEXIS 8921, No. 99–1552, 2000 WL 556878, at *4 (8th Cir. May 5, 2000) (same). Thus, the district court properly denied Arrington's motion to suppress his statement.[16]

*Id.* at 856–57.

Although written prior to *Arrington,* the following comments support its rationale:

---

**16.** *Holman v. Kemna,* 212 F.3d 413 (8th Cir.2000), is in accord with the *Arrington* view that there are exceptions to the bright-line *Edwards* rule:
[D]espite our finding that Holman was subject to police-initiated custodial interrogation on October 23, after having invoked his right to counsel, we are still unable to conclude that the admission of the confession obtained the next day violated his Fifth and Sixth Amendment rights. Other circuits have noted that various factors such as a break in custody or a lapse in time may vitiate the coercive effect of an impermissible interrogation so that the admission of subsequent statements is not barred by the *Edwards* rule. *See Hill v. Brigano,* 199 F.3d 833, 842 (6th Cir.1999) (lapse in time), petition for cert. filed (U.S. Mar. 21, 2000) (No. 99–8773); *United States v. Gomez,* 927 F.2d 1530, 1539 n. 8 (11th Cir.1991) (same); *Dunkins v. Thigpen,* 854 F.2d 394, 397 (11th Cir.1988) (break in custody dissolves a defendant's *Edwards* claim); *McFadden v. Garraghty,* 820 F.2d 654, 661 (4th Cir.1987) (same). We do not believe these circumstances to be exhaustive and think that other scenarios may also militate against the finding of an *Edwards* violation. We believe this is such a case. *Id.* at 419.

It is hardly surprising that the trend is clearly towards finding that not every minute of incarceration also constitutes custody for *Miranda* purposes. The cases made sense in the context of the Court's broader statements about the meaning of custody. *"Miranda*'s requirement of warnings and its establishment of a right to counsel as an adjunct to the fifth amendment's guarantee against compulsory self-incrimination were predicated on the inherently coercive nature of confinement in police custody following an arrest." There is little in the Court's cases to suggest that the great potential for coercion existing shortly after arrest, or arguably at any time pre-trial, also continues to exist for every moment of all the subsequent years of the defendant's incarceration. Even in the early pre-trial, post-arrest stages, the inherently compelling nature of custody is a fiction in many cases. *There is no good basis for extending this fiction to insulate some suspects from questioning for years or even their entire life based on a single request, long ago, for counsel.*

The cases finding that an inmate is not necessarily in *Miranda* custody even at the moment when he is interrogated in prison demonstrate that an inmate is surely not in *Miranda* custody during the long period of incarceration, before any interrogation, when he is merely a prisoner serving his sentence.

\* \* \*

There is no question that *Miranda* custody and, thus, any existing question-proof status, ends when an inmate leaves the prison facility on bail or at the completion of his sentence. Release into the general prison population as a sentenced prisoner can have the same effect, ending both *Miranda* custody and the question-proof status conferred by an earlier invocation of the right to counsel.

While release into the general population as a sentenced prisoner is obviously quite different than release to one's home, it is still a significant event for *Miranda* purposes. Release into the general prison population places an inmate in a very different atmosphere than the one he endured

after arrest as a pre-trial detainee, worried and uncertain about his fate with regard to the pending charges.

A sentenced prisoner, settled into the routine of his new life in the general prison population, is incarcerated but may well be out of *Miranda* custody. Of course, he may and probably should be deemed to have returned to a custodial state once he is approached for questioning. But the extended period of time during which the inmate was incarcerated but was not in *Miranda* custody is a break in custody that has the effect, like any other break in custody, of allowing his question-proof status to end. Once the bar against approaching him ends, the incarcerated suspect, like a suspect who is out on bail, can be taken back into custody, informed of his *Miranda* rights again, and questioned about a different crime.

When a defendant leaves the station house, such as on bail, and resumes the normal routines of life, the Court has recognized that he no longer requires the protection of the *Edwards* prophylactic rule. Such a defendant is entitled to the usual *Miranda* protections, but not the additional prophylactic protection of being rendered question-proof. Likewise, the inmate who has assumed his new routine in prison no longer needs the extra protection of *Edwards*. The restraints necessarily imposed by incarceration become familiar matters to inmates and do not create the coercive circumstances in which it must be presumed that one's free will is overborne.

Magid, Laurie, *Questioning the Question–Proof Inmate Defining Miranda Custody for Incarcerated Suspects*, 58 Ohio St. L.J. 883, 947–49 (1997) (footnotes omitted) (emphasis added).

Clark was arrested for the Houghteling murder and was never released on bond after his request for counsel on November 6, 1992. He takes the position that the preclusive effect of his invocation of his right to counsel endures indefinitely unless he reinitiates communication with the police. According to appellant, the time gap between the request for counsel and reinterrogation makes no difference, nor does the

fact that, after counsel was requested, he pled guilty to the Houghteling murder and was incarcerated for over five years for that crime. Although not cited by appellant, the majority opinion in *Green* supports appellant's interpretation of *Edwards*.

The practical effect of adopting the rule suggested by appellant would produce absurd results. It would create a class of prisoners who are forever question proof-even though law enforcement officers would often have no way of knowing that the prisoner enjoys question-proof status.

*Edwards, Roberson,* and *Minnick* were all cases in which reinterrogation took place within three days of the prisoner's invocations of their right to counsel. The evil sought to be avoided was police badgering. But with a gap of more than five years between police interrogation sessions, it is impossible to say that the Montgomery County police "badgered" Clark into waiving his right to counsel. Application of the *Edwards* rule to cases like the one at hand would not help achieve *Edwards*'s goal of preventing police badgering, nor would it accomplish any other discernable public good.

Common sense dictates that, if a rule is devised to prevent badgering a suspect into giving up his right to counsel, and because of an immense time gap, no badgering even arguably occurred, then blind obedience to the rule is not required. Put another way, when, as here, "the factual circumstances of a case fall into a predictable, potentially recurring pattern to which the underlying policy of *Miranda* and *Edwards* cease to apply, then so too does the bright-line of *Edwards* cease to shine." *Kochutin,* 813 P.2d at 310 (Bryner, J., dissenting). For the foregoing reasons, as well as those set forth in *Arrington,*[17] the portion of the law review article by Magid,

---

17. The reasoning in *Arrington* was very similar to that used by the court in *United States v. Hall,* 905 F.2d 959, 963 (6th Cir.1990). Hall, while in state prison, serving a state sentence, was suspected of making a written threat on two federal officials. Hall escaped from jail, but was captured; when he was arraigned on escape charges, Hall invoked his right to counsel. Three months after requesting counsel, he was

quoted *supra*, and Chief Judge Bryner's dissent in *Kochutin*, we hold that: (1) a break in custody is an exception to the rule set forth in *Edwards*; (2) for *Miranda* purposes, the five plus years appellant spent in prison after invoking his right to counsel constituted a break in custody; (3) the trial court did not violate the *Edwards* rule in denying appellant's motion to suppress his September 1998 statement to police.

## IX.

 Appellant next argues that the trial court erred in denying his motion to suppress an eyeglass case and its contents because those items were beyond the scope of the warrant issued to search appellant's truck and because the police failed to list the eyeglass case in the inventory filed after the search.

The police obtained a warrant in November 1992 to search appellant's pickup truck and to seize fifteen items:

(1) hairs[,] (2) fibers[,] (3) blood[,] (4) keys[,] (5) sheet[,] (6) VHS tapes[,] (7) National Cathedral H.S. ring[,] (8) black leather valise[,] (9) audio cassette tapes[,] (10) gold ladies watch[,] (11) diamond ring[,] (13)[sic] silver choker necklace[,] (10)[sic] female clothing[,] (11) Clark's personal papers[,] (12) Houghteling's personal papers[,] (13) glass unicorn[,] (14) mattress pad[,] (15) sleeping bags.

When searching the truck, the police found a dark eyeglass case with a hinge. They opened the case and found that it

---

questioned by federal agents about his threats on federal officials. After being advised of his *Miranda* rights, he confessed to the federal charge and was convicted. *Id.* at 960. The court found his confession was not barred by *Edwards* or *Roberson* because during the gap between his request for counsel and reinterrogation Hall remained in jail, but he was there because he was already serving a prior sentence. The court held that Hall was not "in custody" as that term has been used in the context of *Edwards* and *Roberson*. The court observed that one could readily argue that Hall was more comfortable within the surroundings in which he was interrogated than the two Secret Service Agents who interrogated him. *Id.* at 962. The court concluded that *Edwards* cannot "be interpreted within this appeal to grant to Hall such a blanket protection continuing *ad infinitum*." *Id.* at 963.

contained sandy soil. The police seized the eyeglass case and its contents but, through inadvertence, did not list it in their inventory filed later. A motion to suppress the eyeglass case and its contents was made by appellant prior to trial, but the motion was denied.

At trial, neither the eyeglass case nor its contents was admitted into evidence. FBI Trace Evidence Examiner Bruce Hall did testify that the "likely source" of the soil in the eyeglass case was the disturbed area in the Clark plot in the Massachusetts cemetery.

The issue as to whether the trial judge should have granted the suppression motion regarding the eyeglass case is immaterial, inasmuch as neither the case nor the soil was admitted into evidence. And, appellant does not argue that the testimony of Agent Hall should not have been admitted.[18] If that argument had been made, we would have ruled that it was waived because Agent Hall's opinion concerning the soil came in without objection.[19]

## X.

■ Appellant argues that the trial court erred in admitting into evidence the hypnotically enhanced testimony of Carl

---

**18.** The State subscribed to the theory that the dirt in the eyeglass case may have been a bizarre souvenir of his burial of Michelle's body.

**19.** Agent Hall testified on direct examination, without objection, that he compared soil samples from the disturbed area in the Clark plot in the Wellfleet cemetery with soil from the eyeglass case. He said that the soils were not an "absolute match like one might get from a fingerprint," but that sample from the eyeglass case and the disturbed area exhibited the same makeup (quartz and other miscellaneous minerals) and both samples exhibited an orange coating. He opined that the soils in both samples had the same color, texture, and composition, and therefore, the soil from the Clark cemetery plot was the "likely source" for the soil in the eyeglass case. Because the foregoing testimony came in without objection, it does not matter that earlier, when Agent Hall was asked on direct examination, "And could you find any difference in composition, texture, or color between those two samples?" that appellant's counsel objected. *See S & S Building Corporation v. Fidelity Storage Corporation,* 270 Md. 184, 192, 310 A.2d 778 (1973) (error, if any, in admission of certain testimony over objection was not prejudicial when the same testimony was given later without objection).

Dorr. A key element of appellant's defense was the contention that he would not have had enough time to kill Michelle, clean up the room, remove the child's body, and still get to work by 2:46 p.m., which was the time he started work, according to his employer's records.[20] From appellant's perspective, the later in the day that Carl Dorr had seen his daughter, the better it would be for the defense—assuming, of course, that the jury believed that appellant went to work at 2:46 p.m. on May 31st.

On August 1, 1996, Carl Dorr was hypnotized and questioned by the police.[21] Under hypnosis, Mr. Dorr was asked, among other things, when he last saw Michelle alive.

Prior to Mr. Dorr's taking the stand, a hearing was held on appellant's motion to exclude the hypnotically enhanced testimony. At the hearing, appellant's counsel proffered that prior to being hypnotized, Mr. Dorr had never given a time estimate (regarding the last time he saw Michelle) that was earlier than 1 p.m.; but under hypnosis, Mr. Dorr said his last sighting could have been as early as 12:30 p.m. The prosecutor proffered that during hypnosis Mr. Dorr also estimated, "It could have been 1:30. It could have been 2:00."

The trial judge accepted the proffer that, prior to hypnosis, the earliest Mr. Dorr said that he last saw Michelle was one o'clock, and after hypnosis, he said the earliest that he could have last seen her was 12:30 p.m. The court nevertheless ruled that Mr. Dorr could testify inasmuch as his pre- and post-hypnotic testimony were "sufficiently close" estimates. The court found it important that at no time prior to hypnosis—or afterward—had Mr. Dorr identified a particular time when he last saw his daughter. Instead, both before and after hypnosis, he identified a range of times, and both pre- and post-

**20.** The State did not concede that appellant really did start work at 2:46 p.m. on the date Michelle disappeared. The State produced a witness who saw appellant's pickup truck parked at his brother's house about 3 p.m.

**21.** There was a dispute in the trial court as to whether Mr. Dorr was, in fact, hypnotized. The motions court found that he was.

hypnotic statements included times generally within that range.

Hypnotically enhanced testimony is usually inadmissible. An exception exists, however, when a witness testifies in accordance with statements that can be demonstrated to have been made prior to hypnosis. *State v. Collins*, 296 Md. 670, 702, 464 A.2d 1028 (1983). The issue here is whether Mr. Dorr's testimony meets the test set forth in *Collins*. We agree with the trial judge that it does. Both before and after hypnosis, Mr. Dorr was very uncertain about the time that he last saw his daughter. That great uncertainty carried over into Mr. Dorr's trial testimony when he testified as follows:

Q [PROSECUTOR]: Now, up until that point of going to talk to Jeff [appellant's brother] and saying essentially, "Where is Michelle? Can Michelle come outside," do you have any absolutely specific recollection of the last time it was that you saw your daughter?

A: No, I do not.

Q: Could it have been 2 o'clock?

MR. SHEFFERMAN: Objection.

THE COURT: Sustained.

Q: What is the earliest in the day that you think it may have been and what is the latest? In other words, I am asking for a range of when you last saw your daughter.

A: May [sic] 12:30 to 1:00—

MR. SHEFFERMAN: Objection.

THE COURT: Overruled.

THE WITNESS:—to maybe 2 o'clock or 3 o'clock.

The common denominator between Mr. Dorr's statements before he was hypnotized and after he underwent hypnosis was that he was uncertain as to when he had last seen his daughter. The reason for excluding post-hypnosis testimony is the fear that something may have been intentionally or unintentionally said during hypnosis that might change the witness's memory. While it is true that after hypnosis, his statement changed from "1:00 p.m." to "12:30 to 1:00," that

change was insignificant in light of the fact that he had always made it clear that he was quite uncertain as to the time he had last seen his daughter. In sum, we agree with the trial court that the hypnosis that Mr. Dorr underwent did not result in any material change in his recollection.

## XI.

While Mr. Dorr was on the stand, appellant's counsel wanted to ask him whether, between February and May 1986, he was using alcohol and marijuana "heavily." Counsel contended that this question was relevant in considering whether Mr. Dorr was telling the truth when he denied that in February of 1986 he told Michelle's mother that he was going to abduct Michelle and that he was not going to pay child support. Defense counsel also contended that the question was relevant because it reflected upon Mr. Dorr's ability to remember. Appellant's counsel admitted at a bench conference that he did not have any medical expert prepared to testify that marijuana impaired one's long- or short-term memory but said that it was "common knowledge" that substances such as alcohol and marijuana "do affect people's perception and memory." The trial judge sustained the State's objection to the question whether appellant had been using marijuana heavily but indicated that he would allow counsel to ask whether Mr. Dorr had been imbibing alcohol heavily during the February to May 1986 time period.

While cross-examination about drug use is not automatically barred, it is for the trial court to balance the probative value of the inquiry against the potential for unfair prejudice to the witness. "Otherwise, the inquiry can reduce itself to a discussion of collateral matters which will obscure the issue and lead to the fact finder's confusion." *Lyba v. State,* 321 Md. 564, 570–571, 583 A.2d 1033, (1991) (quoting *State v. Cox,* 298 Md. 173, 178, 468 A.2d 319 (1983)). Prior to ruling that counsel could not inquire about marijuana use, the trial judge noted the absence of medical evidence proving that the use of marijuana affected one's memory. He also alluded

to the fact that marijuana use is a crime and might unfairly prejudice Mr. Dorr.

A witness may be impeached on the basis of alcohol and marijuana use under some circumstances. But the cases that have allowed such testimony have done so on the basis that it is generally accepted that the use of alcohol and many drugs can affect one's ability to perceive an event, such as a crime or an accident. In *Lyba*, the questions concerned the victim's ability to perceive her attacker at the time of the attack and on another day when she happened to see him again. 321 Md. at 568, 583 A.2d 1033. In *Matthews v. State*, 68 Md.App. 282, 511 A.2d 548 (1986), the issue was whether a witness could testify that, in her opinion, the victim was under the influence of drugs at the time of the crime. We stated in *Matthews* that it was "axiomatic that evidence of a witness's intoxication at the time of the event about which he is testifying is admissible for the purpose of impeaching his credibility." *Id.* at 289, 511 A.2d 548. In *Hickey v. Kendall*, 111 Md.App. 577, 614–615, 683 A.2d 789 (1996), we noted that it would have been helpful for the jury to have known how much alcohol and/or marijuana a witness had consumed and when he had consumed it prior to the accident about which he testified.

In contrast, here the challenge to Mr. Dorr's abilities to observe and/or his memory related to matters that were quite collateral to any issue to be decided by the jury. None of the questions focused on whether Mr. Dorr was impaired or intoxicated on the date he made the [abduction or child support] statements or on the date of Michelle's disappearance but, instead, covered a period of four months—not a discrete period where, if one were not sober, short-term memory (arguably) might be affected by marijuana use. The trial court did not err.

## XII.

Appellant, lastly, contends that the trial court erred in preventing his counsel from proving that the police were unable to corroborate Mr. Dorr's account of his activities on

the day of Michelle's disappearance. When Officer Farrell was on the stand, appellant's counsel brought out the fact that when he interrogated Carl Dorr he played the role of the "bad cop." Defense counsel further established that one of the reasons that Officer Farrell was "being aggressive" toward Mr. Dorr was because Mr. Dorr was "a potential suspect." Appellant's counsel then asked: "And another reason that you were being aggressive with him is that from what you learned from Carl Dorr about what he did that day the police could not corroborate what...." The prosecutor then interrupted by objecting before the question was complete. It is clear, however, that appellant's counsel intended to ask the officer whether other police officers could corroborate Mr. Dorr's statement regarding his activities on the day that Michelle disappeared. The trial judge, at a bench conference, asked appellant's counsel, *inter alia*, why the hearsay rule would not prohibit Officer Farrell from answering that question. Appellant's trial counsel answered as follows:

> Well, because ... the State has brought out that he was a suspect, that they were being aggressive. They brought out all these tactics. The reason that they were suspicious of him was because they could not corroborate what he did that day.

The question was disallowed. Properly analyzed, the question called for double hearsay. Officer Farrell was asked, in legal effect, to tell the jury what out-of-court declarants (unnamed police officers) had learned from talking with third parties about Mr. Dorr's activities. The objection was properly sustained.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**