795 A.2d 776

**STATE of Maryland,**

v.

**David DELEON.**

**No. 866, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

April 3, 2002.

646

Michelle W. Cole, Staff Atty. (J. Joseph Curran, Jr., Atty. Gen., Kathryn Grill Graeff, Asst. Atty. Gen., Baltimore, and Scott L. Rolle, State's Atty. for Frederick County, Frederick, on the brief), for appellant.

Daniel Q. Mahone, Frederick, for appellee.

Argued before MURPHY, C.J., JAMES R. EYLER and CHARLES E. MOYLAN (Ret., specially assigned), JJ.

JAMES R. EYLER, Judge.

On December 20, 1999, David Deleon, appellee, was charged with child sexual abuse and related charges in the District Court of Maryland for Frederick County. The alleged victim was a nine-year-old child, Katie W. (Katie). On February 15, 2000, appellee was charged with similar offenses against Katie's seven-year-old sister, Amanda W. (Amanda). The alleged victims were the grandchildren of appellee's then girlfriend, Rosemary P. At the time of the alleged incidents, the alleged victims, their mother, and Rosemary P. all lived with appellee in his residence.

On February 17, 2000, a criminal information was filed in the Circuit Court for Frederick County with respect to the alleged abuse of Katie, and on April 12, 2000, a criminal information was filed in circuit court with respect to the alleged abuse of Amanda. On June 16, 2000, the cases were consolidated. On November 27, 2000, the State filed in circuit court an indictment that had been returned by a grand jury on November 22. On December 5, the State *nol prossed* the charges in district court.

The cases were scheduled for jury trial in circuit court on May 21, 2001. On February 15, the court began hearing preliminary motions. On May 21, the State *nol prossed* the charges relating to Amanda. On May 21 and May 22, hearings and various discussions took place in chambers between the court and counsel. Based on information that became known at that time, appellee filed a motion to dismiss the indictment, alleging prosecutorial misconduct. On May 23, 2001, the court held a hearing, and on May 29, 2001, the court granted the motion. The State noted an appeal and raises as the sole issue whether the circuit court erred in granting the motion. We shall reverse the judgment of the circuit court.

### Factual Background

The following background information reflects our review of the transcripts contained in the record. There are no transcripts of the grand jury proceedings. Additionally, from time

to time, various discussions took place between counsel and the court, the content of which is not reflected in the record. In this summary, we will set forth only those matters pertinent to the issue before us.

On March 21, 2000, Dr. Nerita Estampador–Ulep, a physician with the Montgomery County Department of Health and Human Services, conducted interviews and examined the alleged victims. Dr. Estampador–Ulep's examination revealed no physical signs of abuse with respect to either child. The examination of Katie revealed pustule lesions, which Dr. Estampador–Ulep swabbed and sent to American Medical Laboratories for testing. Dr. Estampador–Ulep also took a blood sample from Katie and sent it to the same lab for testing. According to Dr. Estampador Ulep's records, the purpose of the tests was to "rule out herpetic lesions."

Subsequently, the State obtained a blood sample from appellee and sent it to the same laboratory to test for herpes virus. A lab report dated July 6, 2000, indicates that the test was positive for both HSV–I and HSV–II (Herpes Simplex Virus) antibodies. Type I herpes simplex virus is generally marked by sores around the mouth or nose, and type II herpes simplex virus is marked by lesions on the genitalia. *Stedman's Medical Dictionary* 709 (25th ed.1990). The July 6, 2000, lab report indicates that appellee's HSV–I antibody reading was 2.99 and his HSV–II antibody reading was 4.19. The report sets forth the following reference ranges for both HSV–I and HSV–II:

| Less than 0.91 | No detectable antibodies |
|---|---|
| 0.91–1.09 | Equivocal |
| Greater than 1.09 | Positive |

On December 22, 2000, appellee filed a motion for an order requiring the State to provide a transcript of the grand jury testimony for purposes of cross-examination at trial. A transcript of a later proceeding reveals that the motion was denied without a hearing, but we were unable to locate an order or a docket entry. In any event, as previously noted, the record does not contain a transcript of the grand jury proceedings.

On February 15, 2001, the court held a hearing on the following motions filed by appellee: (1) motion to dismiss on the ground that his right to a speedy trial had been violated, (2) motion to sever the cases for trial, and (3) motion for reduction of bond. Subsequently, the court denied the motion to dismiss, and the consolidation became moot because the State *nol prossed* the charges relating to Amanda. With respect to the motion to reduce bond, the transcript reveals that appellee had been incarcerated since December, 1999, on a $300,000 bond. The court ruled that it would accept a pledge of the deed to appellee's residence, if it were free of encumbrances. The record indicates appellee was subsequently released from custody. During the course of the argument at the hearing, to the extent pertinent here, the prosecutor, in arguing the strength of the State's case, argued that the State had medical evidence that Katie had contracted genital herpes from appellee.

On May 9 and 10, 2001, the court held another motions hearing. The purpose of this hearing was to determine if Dr. Estampador–Ulep, an expected State's witness, could testify to statements made to her by the alleged victims. The State had previously filed a notice of intention to use out-of-court statements by sexual offense victims, pursuant to Maryland Code, art. 27, section 775.[1] The prosecutor argued that Dr. Estampador–Ulep was not a treating physician, and therefore, while the statements were not admissible as a hearsay exception, they were admissible under section 775.

At the hearing, Dr. Estampador–Ulep testified in detail with respect to the time, place, and circumstances of all statements made to her by the alleged victims. During the course of the testimony, she stated that she found no physical injury during her examination of the children. She did find pustule lesions in Katie which she described as a "blister." She scraped the

---

1. This section provides that certain out-of-court statements made by child abuse victims are admissible in a criminal trial. Md.Code (1996 Repl.Vol., 1999 Supp.), art. 27, § 775. *See Prince v. State,* 131 Md.App. 296, 748 A.2d 1078 (2000) (applying test under section 775 to determine trustworthiness of child's out-of-court statement).

lesions for a culture and did "antibodies." Dr. Estampador–
Ulep further testified that Katie had type I herpes, stated this
was usually the genital type, based on the presence of lesions,
and observed that the "antibody was way up." The testimony
and the argument of counsel concentrated, however, on the
statements by the alleged victims and whether they were
trustworthy. In ruling, the court observed that everyone
seemed to agree that Katie had genital herpes but noted there
was no physical evidence of abuse in the record other than
lesions, which neither corroborated nor excluded the alleged
abuse. The court ruled that the out-of-court statements of
both alleged victims were not reliable and would not be
admissible at trial.

On May 21 and 22, 2001, the court held further proceedings
on the record. There had been a plea offer by the State, and
appellee was voir dired to establish that he understood the
offer. The prosecutor represented that, if the offer were
rejected, the State would go forward only as to Katie because
it was the stronger case "with the herpes and everything."
Appellee rejected the plea, and the State *nol prossed* the
charges as to Amanda.

The prosecutor raised the possibility of stipulations with
respect to laboratory tests. It is apparent from the transcript
that there had been prior discussions, but the content of those
discussions is not reflected in the record. It is clear that at
some prior point in time, Rosemary P. had turned over to the
State a bed comforter that was then sent to the Maryland
State Police Crime Laboratory for testing. As of May 21,
according to the record, defense counsel had the results of the
blood tests and the comforter test but did not have the results
of any culture. Defense counsel stated that he would not
stipulate to the result of the test on the comforter, nor would
he stipulate to the result of the blood test on Katie. The
prosecutor explained that he was only seeking a stipulation as
to chain of custody with respect to the blood and the comfort-
er. With respect to the blood test, the prosecutor further
explained that he understood the defense did not challenge the
findings but did challenge the interpretation of them. The

prosecutor observed that defense counsel could cross-examine the lab representative (expected to be Dr. Nathan Sherman) when the State called him as a witness.

Defense counsel stated he had a basic problem with the reliability, and thus admissibility, of the tests and would not stipulate to them. Defense counsel questioned the reliability of blood testing for herpes, suggesting instead that there should be a "scraping" taken from a herpetic lesion because that was the more reliable way to test for herpes. Ultimately, defense counsel agreed to stipulate to the chain of custody with respect to the blood test and the test on the comforter. The court agreed to hold a hearing on the question of whether the form of testing, in both instances, was reliable and generally accepted.

The court, prior to holding that hearing, heard argument on the State's position that Katie's out-of-court statements to Dr. Poirer, an alleged treating physician, were admissible through Dr. Poirer pursuant to Rule 5–803(b)(4). Defense counsel opposed the State's request and asserted that Dr. Poirer was not a treating physician but rather saw Katie at the request of a detective. The prosecutor also argued that Katie's out-of-court statements to detectives were admissible as prompt complaints of sexual assault pursuant to Rule 5 802.1(d). Defense counsel also opposed that request. The court deferred ruling until trial. There was discussion about the admissibility of a photograph depicting appellee in a robe that matched a description given by Katie. The court did not rule on that issue. Finally, the parties argued appellee's request that the jury visit appellee's residence. The court did not rule then, but at a later time, after the court visited the scene, it granted appellee's request.

On the afternoon of May 21, the court was ready to proceed with the hearing on the reliability of the form of testing performed on the blood and the comforter. No witnesses were present, and the prosecutor proffered that the lab representative would testify that the blood test was generally accepted as a form of testing for herpes and that the result of

the test on Katie was "equivocal." The prosecutor stated that the defense position that "scrapings" were the preferred method of testing and ascertaining the meaning of "equivocal" were matters that went to the weight of the evidence, not its admissibility.

The hearing continued on May 22. Cathryn Braunstein, a chemist with the Maryland State Police Crime Laboratory, testified about the test performed on the comforter. Counsel conducted direct and cross-examination with respect to the reliability of the test. The court, over objection of both parties, asked the witness questions about the results of the test. Defense counsel followed up with further questions. In response to questions from the court and defense counsel, the witness stated that the comforter contained a stain consisting of semen and non-semen. A DNA test revealed the semen was likely from appellee, but the non-semen consisted of a mixture of male-female substance. The female portion predominated and was from two or three females, although none of it was from the alleged victims. The court ruled that the test on the comforter did meet the criteria for being scientifically reliable, and it would not be excluded on that basis.

In the afternoon of May 22, the parties again discussed the need for a similar hearing with respect to the blood test. In the course of that discussion, the prosecutor stated:

Here's another problem, Your Honor, with regard to that. There was a culture taken from the child. It was never requested to be independently tested by the defense. It does exist.... We have a piece of evidence in this case that hasn't been tested, it would appear.

. . . .

So, Your Honor, we need to verify, I guess, that the culture has been tested, if all of a sudden now—I mean the motion to suppress was withdrawn. I had no idea that herpes testing via blood would be challenged. It's just an acceptable form of testing. If he's now saying the only way to test is to test the culture and you're going to make that ruling, I

don't know what to do. I mean should we go get the culture tested if it hasn't been tested already?

THE COURT: Has it been tested?

PROSECUTOR: We have no first-hand knowledge that it's been tested. There's nothing—this was never brought up until, I guess, really until last Friday, or even really this morning, I guess.

THE COURT: Well, that's true, but you certainly know whether or not it's been tested because if it was tested and negative, that would be exculpatory.

PROSECUTOR: Absolutely. We have no reports that have been provided to us, nor do we have—nor prior to today have we ever inquired about that because we had a positive blood test.

THE COURT: And so what do they tell you now that you inquire? What was the testing on the swab?

PROSECUTOR: We don't—they believe that it was tested. No one knows for sure whether it was positive or negative, but what we should probably do is determine what the test was first so we can determine whether it was positive or negative. Otherwise, we may be proceeding with a piece of exculpatory evidence or a piece of inculpatory evidence. But the defense never requested that it be tested, and the State, if it was tested, no one ever provided us, via our subpoenas for all the records, with the test, and we didn't even look into whether it was tested until today at noon.

Based on representations made by counsel for the parties, it appears that, prior to the afternoon of May 22, counsel had only a one page report from American Medical Laboratories. The report described the results of the blood test. On the afternoon of May 22, the State received by facsimile a five-page American Medical Laboratories report from Dr. Estampador Ulep's office. The report, dated March 22 and March 23, 2000, showed that the culture from Katie's scraping was negative.

The court proceeded with the hearing to determine the reliability of the blood test. The State called a representative

from American Medical Laboratories, Dr. Charles Repeddy, to testify. The court questioned the witness about the results of Katie's blood test. The witness testified that the test showed there were antibodies present to HSV–I, but it did not show that Katie was positive for HSV–II. The witness further testified that HSV–II is genital herpes.

Despite this testimony, the prosecutor advised the court that he planned to call Dr. Repeddy at trial, even though Dr. Repeddy would testify that Katie only had HSV–I, explaining that the witness would also testify that type I could be sexually transmitted. The court pointed out that the witness testified that type I could be transmitted through a number of means. In response, the prosecutor pointed out that the witness could testify to the level of antibodies present in Katie even if he could not testify that Katie had genital herpes.

The circuit court ruled that the blood test would not be admissible in evidence because it was too equivocal. The court further ruled that Dr. Repeddy's testimony would not be admissible because he could not express an opinion that Katie had genital herpes, pointing out that, in fact, he testified that the blood test was essentially negative.

The court and counsel continued to discuss what the State intended to do at trial. The prosecutor indicated that Dr. Estampador–Ulep could testify with respect to the presence of lesions. The court responded that Dr. Estampador–Ulep could not link the lesions to anything because the culture was negative. The prosecutor then stated he probably would not call her except possibly in rebuttal.

Appellee then filed the motion to dismiss, which is now before us. On May 23, 2001, the court held a hearing on that motion. Appellee argued that the State (1) intentionally withheld exculpatory evidence, (2) misrepresented that Katie had tested positive for genital herpes to the grand jury, the court, and defense counsel, and (3) acted inappropriately in another case in which appellee was involved. With respect to the concealment and misrepresentation issues, the prosecutor asserted that Dr. Estampador–Ulep had not told him about the

culture result, and he expected her to testify that Katie had genital herpes and that it had been communicated by appellee. He explained that when he called Dr. Repeddy to testify, he thought it was to establish the testing procedure, not to interpret the results. He further explained that he had earlier spoken to Dr. Sherman at American Medical Laboratories, and he understood from him that the test results were consistent with someone who had been exposed to HSV–II virus. Finally, the prosecutor asserted that when he learned about the result of the culture, he contacted Dr. Estampador–Ulep, who advised that the culture was negative because she had not taken a proper specimen, explaining that she did not "burst the blister or scrape it off."

With respect to the related case issue, the court received testimony. The testimony revealed that, prior to the allegations of child abuse, appellee had required the children, their mother, and Rosemary P. to leave his residence. Appellee did so because he believed Rosemary P. had forged checks in October, 1999, drawn on his bank. Appellee initiated charges in district court. On May 5, 2000, an investigator for the State's Attorney's Office spoke to appellee while appellee was in jail awaiting trial on the charges involved in this case. The investigator testified that he did not know why appellee was incarcerated and did not know that the parties in the forgery case were involved in this case. He stated that he did not discuss the child abuse allegations with appellee. The prosecutor in the forgery case testified that she knew appellee had a pending criminal charge but did not know the facts of this case at the time that she was prosecuting the forgery case, and she did not know the two cases were related. Rosemary P.'s defense in the forgery case was that appellee had given her permission to draw checks on appellee's account. She was found not guilty on the forgery charges. Appellee argued that the State failed to properly investigate and prosecute the forgery charge. According to appellee, had there been a conviction of Rosemary P., it would have affected her credibility as a witness in this case.

We have reviewed the exhibits introduced into evidence at the various hearings. The exhibits include the lab reports. We note that a report dated March 22, 2000, shows that Katie's culture was negative and shows a preliminary blood test reading of 3.33 HSV–I antibodies and 0.99 HSV–II antibodies. A "final report" dated March 23, 2000, shows 0.56 HSV–I antibodies and 0.88 HSV–II antibodies and again a negative culture.

The circuit court dictated a lengthy and thorough opinion that covers 38 pages in the transcript. The court began as follows:

> A defendant's ability to exercise his constitutional rights must not be chilled by heavy-handed prosecutorial conduct. Rather than acting as a minister of justice, [the prosecutor] ... has demonstrated a modus operandi in this case that might be termed 'by hook or crook.' The court has considered all improprieties connected with this case, including multiple instances of prosecutorial misconduct that demand dismissal with prejudice. The cumulative effect of these improprieties operate to outweigh any society interest and prosecuting defendants in favor of the interest of the defendant and the public in the fair administration of justice.

The court then considered the claim that the State had withheld the exculpatory test result performed by the laboratory. The court noted that appellee had filed discovery requests. After discussing discovery rules 4–261(a), 4–263(b)(4), and 4–263(g); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and the responsibilities of a prosecutor under rules 3.3, 3.4, and 3.8 of the Rules of Professional Conduct; the court concluded that the State had the duty to disclose the results of the culture. The court further indicated that Dr. Estampador–Ulep had requested the test and was acting on the State's behalf. The court further stated that, if the prosecutor did not have actual knowledge of the test result, the prosecutor had a duty to learn, observing that deliberate concealment or bad faith was not required in order to justify court intervention. The court also considered whether appellee could have obtained the culture result from

the laboratory but observed that the prosecutor had initially represented that the swab had not been cultured and also represented that the laboratory test results were positive for genital herpes.[2]

The court next considered the claim that the State falsely represented that the laboratory test results were positive for genital herpes and a witness would so testify. The court reviewed the discussions between counsel and the court during the several day period prior to May 29 and summarized them as follows. The prosecutor had, on several occasions, represented that the laboratory test results were positive for genital herpes, and that a representative from the laboratory would testify that Katie had genital herpes. More specifically, on May 21, the prosecutor requested defense counsel to stipulate to the admission into evidence of the blood test result and the results of another test on a comforter that had been given to the State by Rosemary P. After some discussion, the defense refused to stipulate. On May 22, a witness testified that the sample taken from the comforter consisted of semen which matched that of appellee and a DNA mixture that was primarily female. The female portion did not come from either of the alleged victims. With respect to the blood test, the prosecutor advised that he could not produce a witness prior to trial, but later stated he could produce someone that afternoon. The court observed:

At that time [the prosecutor] noted that there was a problem in regard to the culture that had been taken from the child. Previously, when requested as to whether or not that culture had been tested, he stated that it had not. A culture was not taken. On Tuesday afternoon [May 22] he said a culture has been taken from the child. It does exist. It has not been tested.

---

2. We are not certain, but it appears that defense counsel, prior to the proceeding in May, 2001, had a copy of Dr. Estampador–Ulep's record, indicating that the lesions had been swabbed and sent to American Medical Laboratories for testing.

After further discussion, the prosecutor indicated that he needed to verify if the culture had been tested, stating that his office had no record and the subject had never come up. The court then referenced the testimony of Dr. Repeddy, mentioned above, who testified that the blood test was essentially negative. Following its review, the court observed: "So, how anyone could proffer that any scientist from this laboratory would testify that there was the presence of HSV–II [genital herpes] is simply beyond my understanding."

The court considered appellee's allegation that the State had deliberately misled the grand jury. The court observed that the case originated in February, 2000, and that in May, 2001, the prosecutor was still making allegations that the lab test results were positive for genital herpes. The court stated: "Now, it's difficult for me to believe that no one in the preparation of a witness or any of his employees or he himself, because we were at trial, would call and inquire as to what these results meant." The court apparently assumed that the State misrepresented evidence before the grand jury, but the court did not expressly find that the evidence was intentionally misrepresented.

After recognizing the general reluctance of courts to dismiss an indictment with prejudice, the court observed that, in this case, "by the time of a new indictment the defendant's speedy trial rights would be most assuredly violated." Later in its opinion, with respect to speedy trial rights, the court observed: "Although the court has essentially concluded that the defendant is not entitled to a dismissal with prejudice on that ground alone, it has taken the issue into consideration with other [sic] [aggravating] factors."

With respect to other misrepresentations, the court observed that, on May 18, the State offered appellee a plea that had to be accepted by that evening. Appellee did not accept it, and on May 21, the State again offered appellee a plea. Appellee declined. The court found that "false statements were made in the inducement for a plea."

With respect to the forgery case, the court again expressed skepticism about what the prosecutor's office knew and did not know. The court observed that the prosecutor's office should have known about the relationship between the two cases and the better course of conduct would have been for the State's Attorney's Office not to contact appellee without first notifying his counsel. The court concluded: "There may have been no impropriety at all, but it certainly gives an air of impropriety."

Finally, the circuit court took into consideration appellee's pretrial incarceration. The court observed that the amount of the bond was in part as a result of representations by the State with respect to the strength of its case. The court observed that the alleged victims' statements to different persons were substantially different from each other and that both alleged victims at one time or another denied the incidents. The court also observed that there were no physical findings of abuse, and consequently, the corroboration of genital herpes was extremely important.

In conclusion, the court "strained to try to dismiss this indictment without prejudice", but concluded otherwise.[3] The court ended its opinion by explaining:

> What I consider to be outrageous conduct by [the prosecutor] ..., painted the evidence irrevocably and prejudiced the defendant's case on the merits such that notions of due process and fundamental fairness would preclude reindictment. By intentionally persisting and repeating in this line,

---

3. The court observed:

 But by the conclusion of the hearing in regard to the [laboratory representative] ..., it was apparent that [the prosecutor] ... was gonna continue to pursue these specific avenues. In other words, I asked will you be calling the [laboratory representative] ... to testify? Yes I will, Your Honor. I'm gonna have him testify as to HSV–I and the defendant has HSV–I. Well, probably ninety percent of the people in the world have HSV–I. That evidence is of no value at all as an indication of any sexual abuse. I asked him was he going to call Dr. Estampador? He says yes, he was. For what purpose I say? He said for the purpose of having her testify that there were lesions as to the vaginal area. I said why would you want to do that when the swabs came back negative? Oh, well, that's for the jury to decide the weight.

failing to disclose known exculpatory evidence on issues of guilty knowledge, misrepresenting evidence, the prosecutor has denied defendant his constitutional right to an unbiased grand jury.

## Discussion

On appeal, the State contends that (1) the court's factual findings are not supported by the record, and (2) dismissal was not the appropriate sanction. With respect to the first issue, the State, in describing the court's finding with respect to the prosecutor's conduct, states the court found that "the prosecutor intentionally withheld exculpatory evidence and misrepresented the evidence." In light of that statement, the form of the State's contention is puzzling. The State contends that "the evidence in the present case supports a finding that the State did not knowingly or intentionally withhold evidence", as distinguished from contending that the evidence was insufficient to support a finding that the conduct was intentional. In support of its contention, the State argues that the evidence supports a finding that the prosecutor was not aware of the negative test results, and that, even after the negative test results had been disclosed, the prosecutor proffered that it was still Dr. Estampador–Ulep's opinion that Katie had genital herpes.

We do not read the court's opinion as finding that the prosecutor or any State representative acted intentionally and deliberately, with actual knowledge of facts, to conceal or misrepresent evidence. We do note that the court, in its concluding paragraph, does use a form of the word intentional but in context it does not appear to mean that the prosecutor knowingly failed to disclose. On the other hand, the court's reliance on provisions in the Rules of Professional Conduct, which require knowing action, indicate that the court found that the conduct was intentional. In any event, the opinion is replete with findings that the prosecutor and other State representatives, including Dr. Estampador–Ulep, should have known the facts; the prosecutor should have disclosed exculpatory evidence; and the prosecutor should not have repre-

sented otherwise. This constituted improper conduct, which at the very least, the court viewed as something more than inadvertence and constituted an "outrageous" disregard for the State's obligations. If our reading of the court's opinion is wrong and the court did find that the prosecutor acted knowingly and deliberately, with actual knowledge of the result of the culture, the finding is not supported by the record and is clearly erroneous.

With respect to the appropriate sanction, the State argues that a defendant is not entitled to dismissal because a prosecutor places tainted evidence before a grand jury or fails to present exculpatory evidence to a grand jury. The State relies on *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *United States v. Williams,* 504 U.S. 36, 48–52, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992); *State v. Bailey,* 289 Md. 143, 149–50, 422 A.2d 1021 (1980); and *Clark v. State,* 140 Md.App. 540, 558, 781 A.2d 913 (2001). According to the State, appellee is not entitled to dismissal because, even if the prosecutor had been aware of the negative test results, appellee did not have the right to have the evidence presented to the grand jury. The State also argues that a prosecutor's failure to disclose exculpatory evidence after indictment does not warrant dismissal where, as here, the defense was provided with the exculpatory evidence before trial, and the defense was not prejudiced.

Appellee's response to the State's arguments is that the court properly exercised its discretion pursuant to Maryland Rule 4–263. Appellee cites no authorities other than the Rule.

We are not aware of any express authority that would empower a Maryland court to dismiss an indictment based on the kind of prosecutorial misconduct found to exist in this case. While the existence of such power is doubtful, we need not decide that issue because, assuming such power exists, dismissal of this case was not warranted.[4]

---

4. Even assuming that a prosecutor's actions constitute misconduct deserving of sanctions, it is highly doubtful that dismissal of an indict-

 We shall address each act constituting the alleged prosecutorial misconduct, beginning with the grand jury proceedings. We do not know what evidence the prosecutor presented to the grand jury because the record does not contain a transcript of the grand jury proceedings. The circuit court, in its opinion, does not recite what evidence was presented but assumes the grand jury was misinformed as to the results of the tests performed on Katie. Assuming *arguendo* that the State had misrepresented the test results to the grand jury or simply withheld exculpatory evidence, either through the prosecutor or an agent, we conclude that dismissal was not warranted.

The Court of Appeals has addressed the general efficacy of a motion to dismiss an indictment, stating:

> In passing upon the validity of a motion to dismiss an indictment, the appellate courts of this State have been steadfast in holding that: (1) the motion is not a proper vehicle for testing the admissibility of testimonial evidence at trial, *Richardson v. State*, 7 Md.App. 334, 255 A.2d 463 (1969); (2) an unlawful arrest is not a ground for quashing an indictment, *Matthews v. State*, 237 Md. 384, 206 A.2d 714 (1965); (3) a defendant is not entitled to dismissal simply

ment would be proper. *See State v. Hunter*, 10 Md.App. 300, 305, 270 A.2d 343 (dismissal of an indictment for lack of prosecution was beyond the power of the court). *See also Gonzales v. State*, 322 Md. 62, 71–75, 585 A.2d 222 (1991) (where trial court dismissed indictment because of untimely prosecution not amounting to a denial of the constitutional right to a speedy trial, the Court of Appeals expressly did not decide if court had power to dismiss but held, if it did, it abused its discretion); *State v. McKay*, 103 Md.App. 298, 300, 653 A.2d 520 (1995) (applying *Hunter*). The issue, which is not before us in the instant case, is whether the prosecutorial misconduct is of the type and nature to fall within the holding in *Hunter*.

If dismissal is an available remedy, it may not be an appropriate one. Sanctions are based on the character of the evidence, not the character of the prosecutor. Other remedies besides dismissal, such as a contempt of court or attorney disciplinary proceedings, allow the court to focus on the behavior of the prosecutor instead of granting a windfall to an unprejudiced defendant. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *see also Ross v. State*, 78 Md.App. 275, 286, 552 A.2d 1345 (1989).

because the prosecution acquired incriminating evidence in violation of law, even if tainted evidence was presented to the grand jury, *Everhart v. State,* 274 Md. 459, 337 A.2d 100 (1975); (4) an indictment should be dismissed where it has been returned by grand jurors who had been required to show a belief in God, *State v. Madison,* 240 Md. 265, 213 A.2d 880 (1965).

In sum, a motion to dismiss the indictment will properly lie where there is some substantial defect on the face of the indictment, or in the indictment procedure, or where there is some specific statutory requirement pertaining to the indictment procedure which has not been followed.

*State v. Bailey,* 289 Md. 143, 149–50, 422 A.2d 1021 (1980).[5]

In *Clark v. State,* 140 Md.App. 540, 781 A.2d 913 (2001), we held that prosecutorial misconduct that resulted in, a misleading failure to present exculpatory evidence to a grand jury did not warrant dismissal of the indictment. *Clark,* 140 Md.App. at 563, 781 A.2d 913. There, a witness testified before the grand jury that DNA tests were inconclusive, while additional DNA test results, unknown to the witness, conclusively exculpated the defendant. The prosecutor was aware of the exculpatory evidence, but failed to disclose the results to the grand jury. The trial court found that this was an inadvertent and unintentional failure.

In addressing the issue of misconduct, we commented on the nature of a grand jury proceeding.

The grand jury is an inquisitional and accusatory body. It does not determine the guilt or innocence of the accused as that decision is vested in the petit jury or court, if there be a non-jury trial. That an indictment is founded on tainted evidence is no ground for dismiss-

---

**5.** Additionally, a motion to dismiss an indictment cannot test (1) the presentation of hearsay evidence, (2) the competency of witness testimony, and (3) the sufficiency of the evidence. *See generally,* 4 Wayne R. LaFave, Jerold H. Isreal, Nancy J. King, Criminal Procedure § 15.7(a)-(h), at 421–56 (2d ed.1999) (discussing common prosecutorial misconduct claims).

al.... The rules of evidence are not applicable to grand jury proceedings.

*Hopkins v. State,* 19 Md.App. 414, 426, 311 A.2d 483 (1973).

Nineteen years after we decided *Hopkins,* the United States Supreme Court said:

> The grand jury's functional independence from the Judicial Branch is evident both in the scope of its power to investigate criminal wrongdoing and in the manner in which that power is exercised....

> Given the grand jury's operational separateness from its constituting court, it should come as no surprise that we have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure. It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge.... As a consequence, neither in this country nor in England has the suspect *under investigation by the grand jury ever been thought to have a right to testify or to have exculpatory evidence presented.*

*United States v. Williams,* 504 U.S. 36, 48–52, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (citations omitted) (emphasis added). Thus, the *Williams* Court refused to dismiss the defendant's indictment under federal rules that were designed to insure the integrity of the grand jury's functions, even though, in *Williams,* a prosecutor had withheld exculpatory evidence from the grand jury. The Supreme Court said that the grand jury had no obligation to consider all "substantial exculpatory" evidence, and therefore the prosecutor had no binding obligation to present it. *Id.* at 53, 112 S.Ct. 1735.

Although Maryland appellate courts have heretofore not had occasion to analyze *Williams,* the Court of Appeals previously has quoted *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), for the principle that

[t]he grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of *inadequate or incompetent evidence.* ... *Everhart v. State,* 274 Md. 459, 487 [337 A.2d 100] (1975).

(Emphasis added.)

*Clark,* 140 Md.App. at 558–59, 781 A.2d 913. Accepting the trial court's finding, we concluded that dismissal was inappropriate. *Id.* at 558, 781 A.2d 913. *See Bartram v. State,* 280 Md. 616, 625–26, 374 A.2d 1144 (1977) (dismissal of indictment was inappropriate based on alleged prosecutorial misconduct before grand jury).

Courts in other jurisdictions have upheld the sanction of dismissal for prosecutorial misconduct based on the failure to disclose exculpatory evidence before a grand jury. *Clark,* 140 Md.App., at 562, 781 A.2d 913.[6] While the prosecutorial duty to disclose exculpatory evidence may arise from statute, rule, or common law, we recognized in *Clark* that the duty in other jurisdictions was based on "statutes *peculiar* to that jurisdiction" or "relevant common law ... *different* from Maryland's." *Id.* at 561–62, 781 A.2d 913 (emphasis added). *See id.* at 562 n. 4, 781 A.2d 913 (discussing source of out-of-state duty); *see also* 4 Wayne R. LaFave, Jerold H. Isreal, Nancy J. King, *Criminal Procedure* § 15.7, at 440 n. 130 (2d ed.1999)(discussing various state statutes that explicitly require prosecutorial disclosure). We are not aware of any Maryland statutes, Rules of Procedure, or common law authority that expressly imposes a specific duty upon the prosecutor that serves as a basis for dismissing an indictment. Even so, consistent among jurisdictions upholding dismissal for breach of a duty to disclose exculpatory evidence is the requirement that the omitted evidence would have likely pre-

---

**6.** Of the cases relied on by Clark, only two actually dismissed the indictment for failure to disclose exculpatory evidence. *Clark,* 140 Md.App. at 563 n. 5, 781 A.2d 913.

cluded the grand jury's decision to indict. *Clark,* 140 Md.App. at 562–63, 781 A.2d 913.

In *Clark,* we concluded that even if Maryland adopted the view of the jurisdictions discussed above, it would have been improper to dismiss Clark's indictment because the evidence would not have negated guilt. *Id.* at 563, 781 A.2d 913. That observation is equally applicable here. Although the findings by the trial court are stronger than those in *Clark, i.e.,* the State's action was more than mere inadvertence, full disclosure here of the test results would not have negated guilt or undermined the authority of the grand jury to act. We cannot say that disclosure would likely have precluded the grand jury from arriving at a decision to indict. Thus, the test discussed in *Clark,* even if it were applicable, is not met.

■■ With respect to prosecutorial misconduct generally, actual prejudice must be shown before the sanction of dismissal or reversal of a conviction can be properly imposed. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *United States v. Brockington,* 849 F.2d 872 (4th Cir.1988). Even deliberate or intentional misconduct may not serve as grounds for dismissal absent a finding of prejudice to the defendant. *See United States v. Derrick,* 163 F.3d 799 (4th Cir.1998).

■ The question of prejudice with respect to the State's discovery violation will be discussed below. With respect to the alleged misconduct in connection with the prosecution of the forgery charge against Rosemary P., it is doubtful, as previously observed in general terms, whether a trial court has the authority to dismiss an indictment for such misconduct. Assuming misconduct and assuming *arguendo* that a trial court has the authority to dismiss an indictment for such misconduct, there was no finding of, and indeed, no showing of prejudice. We do not know if Rosemary P. had any relevant information. If she did, appellee did not discuss it and explain why her credibility was relevant. Additionally, appellee did

not establish how misconduct was the cause of the not guilty verdict with respect to the forgery charge against her.

■ The circuit court relied on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* set forth the minimum due process requirements for disclosure of exculpatory evidence to ensure that a defendant receives a fair trial. *Brady,* 373 U.S. at 86–87, 83 S.Ct. 1194. *See Conyers v. State,* 367 Md. 571, 602, 790 A.2d 15 (2002); *Jones v. State,* 132 Md.App. 657, 674–75, 753 A.2d 587 (2000) (delineating discovery violations from *Brady* violations; the latter occurs when the State suppresses exculpatory evidence throughout the entire course of a trial). Clearly, *Brady* does not control the instant facts where the disclosure was made and the case against appellee was dismissed prior to the trial. The State did not violate appellee's constitutional right to due process.

The circuit court found that the State violated the Maryland discovery rules. *See* Md. Rule 4–263. The State's Attorney has a duty to produce to the defendant "[a]ny material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged." Md. Rule 4–263(a)(1). The State's Attorney, upon request of the defendant, must disclose the results of certain tests. Md. Rule 4–263(b)(4). The duty of disclosure extends to "staff members and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney." Md. Rule 4–263(g). Upon a failure of the State to comply with Rule 4–263 or an order issued pursuant to the Rule, the trial court may impose "protective orders," including (1) an order permitting discovery of the matters not previously disclosed, (2) strike the testimony to which the undisclosed matter relates, (3) grant a reasonable continuance, (4) prohibit the party from introducing in evidence the matter not disclosed, (5) grant a mistrial, and (6) enter any other order appropriate under the circumstances. Md. Rule 4–263(i). Conspicuously absent from this Rule, in contrast to civil Rule 2–433, is the express authoriza-

tion to dismiss an indictment. It is highly doubtful whether a court has such authority, but again we need not decide that issue.

■■■ The trial court's power to impose sanctions is discretionary, and its decision is reviewed on appeal for abuse. *See Jones v. State,* 132 Md.App. 657, 753 A.2d 587 (2000); *Aiken v. State,* 101 Md.App. 557, 647 A.2d 1229 (1994). Maryland appellate courts require an evaluation of whether actual prejudice occurred in fashioning an appropriate remedy for a discovery violation. *See Patrick v. State,* 329 Md. 24, 617 A.2d 215 (1992); *Warrick v. State,* 302 Md. 162, 486 A.2d 189 (1985); *Pantazes v. State,* 141 Md.App. 422, 785 A.2d 865 (2001). Appellee was not prejudiced by the failure to disclose exculpatory evidence; rather, appellee's defense was helped by the test results. The purpose of Rule 4–263, ensuring that a defendant can prepare a proper defense without unfair surprise, was not furthered by dismissal of the indictment. *See Russell v. State,* 69 Md.App. 554, 518 A.2d 1081 (1987). Assuming the court had the power to dismiss the indictment, we hold that the court abused its discretion in doing so.

The trial court made reference to and relied upon Rules of Professional Conduct. The prosecutor's ethical violations, if any, can and should be handled through the grievance process.

We do not address speedy trial grounds because the case was not dismissed on that basis, and the issue is not before us. On remand, the circuit court is free to decide that issue.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**